RALPH V. RUSSELL AND EDNA RUSSELL, RESPONDENTS, v. UNION ELECTRIC COMPANY OF MISSOURI, A CORPORATION, APPELLANT.—191 S. W. (2d) 278.

St. Louis Court of Appeals. Opinion filed December 18, 1945.

Robert J. Keefe, Clyde H. Snider, Roberts P. Elam and Igoe, Carroll, Keefe & Coburn for appellant.

John A. Woodbridge of counsel.

*Henry C. Stoll* for respondents.

*Orville Richardson* of counsel.

1078

McCULLEN, J.—This suit was instituted in the Circuit Court of the City of St. Louis by respondents, as plaintiffs, against appellant, as defendant, to recover damages for the destruction by fire of plaintiffs' dwelling and the contents thereof alleged to have been caused by defendant's negligence. A trial before the court and a jury resulted in a verdict and judgment in favor of plaintiffs and against defendant in the sum of $7500. After an unavailing motion for a new trial, defendant duly appealed.

The petition of plaintiffs alleged that defendant is a Missouri corporation engaged in the business of distributing electric current as a public utility; that plaintiffs were the owners of an eight room two-story frame dwelling house located on Route #1 in Glencoe, St. Louis County, Missouri, together with furniture and numerous personal belongings of plaintiffs, all contained within said dwelling; that in May, 1941, plaintiffs purchased an electric range from defendant and that during said month defendant installed the same in the kitchen of plaintiffs' dwelling; that it was defendant's duty to install said range, together with the necessary wiring and electrical connections, in such a manner as to render the same reasonably safe for lawful use by plaintiffs; that defendant failed to install said range in a reasonably safe manner, but negligently installed the wiring for said range and caused the same to be and remain in a dangerous condition. The pertinent assignments of negligence are:

''That the defendant caused the said wiring and insulation thereof to be broken and exposing the wire, and that defendant negligently used uninsulated, sharp-edged staples, in securing the said wiring to the interior of plaintiffs' dwelling.

''That the defendant knew or in the exercise of ordinary care could have known that the aforesaid condition of the wire, insulation and staples, was likely to cause a 'short circuit' to develop and cause same to ignite plaintiffs' dwelling, but negligently and carelessly caused said condition to be and remain as aforesaid.

. . . ''that on or about the 3rd day of February, 1942, as a direct and proximate result of defendant's negligence as aforesaid a short circuit did develop in the said wire, and caused plaintiffs'

dwelling to be ignited, and the same together with all its contents was thereupon consumed by fire, all to plaintiffs' damage in the sum of $15,000.00.''

The answer of defendant admitted that it was and is a corporation engaged in the business of distributing electric current as a public utility in the State of Missouri, and denied each and every other allegation contained in plaintiffs' petition.

Defendant contends that the trial court erred in failing to give and read to the jury a peremptory instruction in the nature of a demurrer to the evidence which it requested at the close of all the evidence.

It appears from the evidence that in April, 1941, defendant's salesman Sheley C. Reynolds solicited and procured from plaintiffs a signed contract purchasing an electric cooking range from defendant. Two days thereafter the contract was canceled by plaintiffs. A day or so later Mr. Reynolds visited plaintiffs' dwelling and inquired why the contract had been canceled. Mr. Russell told him he was afraid it would take ''too much of an electric bill.'' Reynolds then said to Mr. Russell: ''We will put that stove in and I promise . . .'' At this point Mr. Russell's testimony concerning his conversation with Reynolds was interrupted by an objection which was sustained. We shall refer to this ruling of the trial court later. Plaintiffs signed a second contract with the defendant purchasing a range three or four days after the first contract had been signed.

Defendant introduced evidence to the effect that on May 8, 1941, plaintiff Ralph V. Russell signed a printed form of agreement and authorization for changes to be made in the wiring of plaintiffs' dwelling which were necessary for the use of the electric range. This printed form of agreement and authorization is referred to as plaintiffs' Exhibit M and also as defendant's Exhibit 4. We shall refer to it as defendant's Exhibit 4. When said Exhibit 4 was first shown by defendant's counsel to plaintiff Mr. Russell at the trial, he said: ''It is permission to give the electric company permission to install the wiring, the electric wires, for the operation of the range.'' The first paragraph of said exhibit constituted an agreement that, in consideration of defendant's undertaking to pay for all or a major part of the expense of installing the ''service entrance facilities,'' such ''service entrance facilities,'' when installed, would become and remain the property of defendant. The ''service entrance facilities,'' according to evidence adduced by defendant, which was not disputed, consisted of ''the service head right outside the building, the service cable between the service head and the switch box, up to and including the switch box.'' The range cable installed in plaintiffs' kitchen, connecting the electric range through an outlet receptacle with the switch box, was not included in the ''service entrance facilities.''

The second paragraph of said printed form of agreement constituted an authorization for the installation by an electrical contractor of the wiring necessary for the use of the electric range—said printed form having a blank space for the insertion of the name of the "Electrical Contractor."

The third paragraph of said printed form of agreement is as follows:

"It is expressly understood and agreed that the Dealer or Electrical Contractor making this wiring installation is not the agent or employe of Union Electric Company of Missouri and that said Company is not responsible for nor does it assume any liability on account of or in connection with the work done or to be done by the Dealer, Electrical Contractor or their agents or employes. It is further agreed that Union Electric Company of Missouri shall be notified in writing by the above-named occupant when the facilities have been satisfactorily installed."

Underneath said third paragraph of the printed form there are two short lines, one for signature by the "Owner" and the other for signature by the "Occupant or Tenant." On the line over the word "Owner" appears the signature "Ralph V. Russell" in penciled handwriting. Underneath said two short lines there is one long line extending across the entire page of the printed form separating the upper from the lower part of the document. Underneath said line appear the following words, which, with the exception of the name of Ralph V. Russell, are in print:

"(The following to be signed by range purchaser after the installation is completed and the range is in operation.)

"The range, terms of payment therefor, and installation of wiring made by the above Dealer are entirely satisfactory to me.

"Ralph V. Russell,

"Occupant of Premises."

The last above signature "Ralph V. Russell" is in penciled handwriting and is admitted to be that of plaintiff Mr. Russell.

With respect to the signature "Ralph V. Russell" on the line provided for "Owner," in the upper part of the printed form of agreement, immediately below the three paragraphs thereof, Mr. Russell gave testimony which has given rise to controversial interpretations by the respective parties. We shall reserve discussion thereof to a later part of this opinion.

The evidence shows that a few days after the range was purchased from defendant by Mr. Russell, George Hoefer, an employee of the County Electric & Gas Appliance Company, did the re-wiring of plaintiffs' residence. Hoefer testified that he never was an employee of defendant. The County Electric & Gas Appliance Company had received from the Wholesale Electric Range Distributors Wiring Bureau (a Missouri corporation) a work order to make the necessary

changes in the wiring at plaintiffs' residence for the use of the range, and it was upon receipt of said work order from his employer that Hoefer did the rewiring work in question. No one from the defendant company told Hoefer to do the work.

The evidence further shows that when Hoefer arrived at plaintiffs' residence he was met by plaintiff Ralph V. Russell who inquired what he wanted. Hoefer explained that he had been sent out to install the necessary wiring for the range, and proceeded to do the work. He tore out all of the old wiring and facilities from the service head down to the three service (fuse) boxes, including the old conduit carrying the service wires, the old main switch box and the old meter. He installed a new meter and a new switch box containing a combination of a switch and fuses in the same location in the summer kitchen where the old ones had been. He also installed by means of "clamps" or "hangers" screwed or nailed to the south wall of the summer kitchen a #6 armored, underwriter's approved service cable from the service head, through the meter, to the switch box. Hoefer also installed a #6 range cable which ran out of the switch box to a point on the south wall of the summer kitchen about a foot below the ceiling, thence went along that wall to the west wall which divided the summer kitchen from the kitchen; then it ran north on said west wall, over the top of the door between the two kitchens, to a point about four feet north of that door; thence downward eight or nine feet to a hole which Hoefer had drilled through that wall and into the kitchen, and through that hole to an outlet receptacle which Hoefer had installed in the kitchen.

Hoefer then reconnected with the new switch box the three old lighting circuits and connected up the new service cable to the service wires outside of the house at the service head. Later, after the range had been delivered to plaintiffs' residence, Hoefer again went out, connected the range into the outlet receptacle, made a "ground" on the installation, and tested the range by operation thereof. While Hoefer was doing the wiring work at plaintiffs' residence, Mr. Russell and various members of his family watched the work as it was being done. No one from defendant company was present at that time.

Mr. Russell testified that he did not employ Hoefer or anyone else to install the range or the wriing in his home; that he did not discuss any transaction relating to the range with anybody except Mr. Reynolds, defendant's representative who sold him the range; that all the payments on the range were made by him to the Union Eelctric Company, and that no payments were made to anyone else. Plaintiffs introduced in evidence a number of cards which Mr. Russell had received from the Union Electric Company every month after the range was installed. These cards were bills for electricity consumed and merchandise purchased. They showed monthly charges of $6.83

for payments on the range. Said bills did not contain any items for wiring installation.

On May 22, 1941, after Hoefer had completed the rewiring and installation of the range his work was inspected by Robert G. Waddell, an inspector from the Missouri Inspection Bureau, also referred to as the Fire Prevention Bureau. On June 7, 1941, the work was inspected by defendant's own inspector John J. Mayer. The inspector of the Missouri Inspection Bureau made a report approving the wiring work, which report was introduced as defendant's Exhibit 6. At the top of said report appears the following: "This copy to Union Electric for final OK."

Defendant's Exhibit 7, introduced in evidence, is a report of the inspection of the wiring and installation of the range made to defendant by its inspector Mayer, which shows that the report was approved June 17, 1941, by defendant and was "Released to Sales Dept." on June 17, 1941, with a notation thereon that "Amount of Payment" was $36, "To Bureau D9924." Defendant admits in its brief that it paid the Wholesale Electric Range Distributors Wiring Bureau $36 for said wiring work. The evidence shows that the County Electric & Gas Appliance Company was paid for Hoefer's work by a check of the Wholesale Electric Range Distributors Wiring Bureau.

Defendant's Exhibit 5 is a "check list" for the wiring job signed in ink by "Co. Elec. & Gas Appl. Co. By C. H. Hoefer." The list contains a typed direction at the top thereof as follows: "Wireman installing Electric Range check the following and be sure that every item has been properly taken care of; then, return this to your office." The list is on a form made up of eleven instructions for the materials to be used and the manner in which the work is to be done. Instruction No. 3 in the list directs that: "#8 wire must not be used where #6 is required by Union Electric's specifications." Hoefer testified that the "check list" was made when the job was completed, but "I don't recall the date when I made that list and sent it out." There is no evidence as to whom the list was "sent out."

The report of the inspection of the wiring work made by Mayer for defendant (defendant's Exhibit 7) is headed: "Union Electric Company of Missouri, Report of Installation of Electric Range." Then follow the name and address of plaintiff Mr. Russell as the customer, the make, type and serial number of the range, after which appears the following:

"Dealer's Name          Union Electric Co.

"Contractor's Name      County Electric & Gas Appl. Co."

Mr. Mayer testified for defendant that plaintiff Ralph V. Russell's signature at the bottom of the printed form of agreement (defendant's Exhibit 4) was signed after the witness made the inspection of the work on June 7, 1941.

Plaintiff Ralph V. Russell and his son Ralph Russell testified that when Hoefer installed the #6 range cable from the new switch box in the summer kitchen to the outlet receptacle he did not use the "hangers" or "clamps" such as he used in installing the #6 armored cable from the service head to the switch box, but instead used ordinary plain iron staples; that on several occasions while Hoefer was doing this work he inadvertently drove the points of staples completely 'though the range cable at points between the switch box and the outlet receptacle; that when this occurred Hoefer would pull out the staples he had driven through the cable and then drive them or or others over the cable properly; and that when such mishaps occurred Mr. Russell asked him if that "wasn't bad business," and that Hoefer replied: "It will be here when you and me are both gone." Hoefer categorically denied the testimony of the Russells on this point and testified that he did not recall ever having used staples instead of "clamps" or "hangers" on or installation of #6 cable.

The two inspectors who inspected Hoefer's work testified for defendant that they found no evidence of any staple having been driven through the cable; that if they had found any such they would not have approved the work. One of the inspectors corrroborated Hoefer's testimony that no staples were used in the installation of the cable. The other inspector did. not recall whether they were or not.

After the wiring and range were installed plaintiffs used the range in the usual way. On February 3, 1942, plaintiffs and their son and youngest daughter, who had been visiting in St. Louis, returned to their home about 8:30 p. m. Plaintiff Edna Russell put some chili on the electric range to cook and turned the burner on low. Plaintiffs and their youngest daughter then left the house to visit a neighbor, leaving plaintiffs' son at home alone. The son was working in the kitchen on a model airplane and listening to a radio. While he was thus working he noticed an odor like burning rubber and thought it might be caused by the radio which he then turned off. The odor continued, however, and about five minutes thereafter he made an investigation and found the odor was strongest near the electric range and the door between the kitchen and the summer kitchen. He opened the door and saw smoke and flames above the top of the door in the southwest corner of the summer kitchen. He ran to the neighbor's home where his parents were and notified them of the fire. They all immediately returned to the home and with the help of neighbors saved from the burning building as much of their property as they could. Shortly thereafter the electric lights in the house and in the whole neighborhood went out when a fuse on a pole on the highway blew out at 9:05 p. m. Mr. Russell testified that he observed that the hands of the electric clock on the electric range indicated 8:45, and the next morning he found in the yard an

electric clock which had been in the front room and its hands indicated 9:05.

Joseph A. Osborn, a consulting engineer, testified as an expert for plaintiffs. He gave it as his opinion, based upon a hypothetical question embodying the evidence adduced, that the cause of the fire was the burning of the insulation of the range cable that ignited the surface of the conducting wire; that this resulted from the puncture of the insulation of the cable by the iron staples penetrating it; that with the insulation punctured there would be a slight leakage of current which would have a tendency to carbonize the surrounding insulation; that this would progress until such time as the path of the carbonized rubber between the two conductors, meaning the wire on each side of the puncture, was sufficient to allow enough current to pass to melt the insulation, put it in a volatile state, ignite it and set the cable on fire; that the passage of current through the broken insulation was simply a leak which increased in magnitude or quantity sufficient to burn the insulation on the cable.

Carlton B. Fox, a consulting engineer, and Alexander S. Langsdorf, Dean of the School of Engineering and Professor of Electrical Engineering at Washington University, testified as experts for defendant that if a staple were driven through a #6 range cable and withdrawn, as testified to by Mr. Russell and his son, no fire would result; that there would be no current leakage, carbonization of insulation or production of heat; that if the driving and withdrawing of the staple affected the insulation between the wires to such an extent as to permit a flow of current between them there would be an immediate short circuit which would blow the fuses and no fire could result.

Before taking up the contentions of defendant, we think it is proper to refer briefly to a contention of plaintiffs. It is strongly urged by plaintiffs that even if the Wiring Bureau, the County Electric & Gas Appliance Company, or Hoefer, were independent contractors, defendant would still be liable for its negligent installation of the wiring. Plaitiffs argue that although the installation of the wiring was not of itself intrinsically dangerous, it nevertheless was likely to result in harm unless necessary precautions were taken; that having once assumed to have the wiring done, defendant could not, in view of the nature of such work, delegate to an independent contractor its own duty to exercise the highest degree of care. A number of authorities are cited by both plaintiffs and defendant on this point, but in view of the conclusions which we have reached we think it is unnecessary to lengthen this opinion with a discussion of plaintiffs' contentions.

It is contended by defendant that the evidence conclusively shows that it is not liable to plaintiffs, because the wiring work was done by an independent contractor pursuant to agreement, defendant's

Exhibit 4, which was signed by Mr. Russell. Defendant cites and quotes from a number of cases and authorities dealing with the relationship of independent contractor to show that Hoefer was not its servant but was the servant of an independent contractor—the County Electric & Gas Appliance Company.

Our Supreme Court, in Skidmore v. Haggard, 341 Mo. 837, 844, 845, 110 S. W. (2d) 726, 729, 730, adopted the definition of independent contractor set forth in the Restatement of the Law of Agency of the American Law Institute, page 11, which is as follows:

"Section 2:

"An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking."

In this case it is clear that Hoefer was not an employee of defendant but was directly employed by the County Electric & Gas Appliance Company. However, under the evidence herein, the question to be determined is not whose employee was Hoefer, but whether or not in its double capacity of purveyor of a dangerous agency called electricity and seller of the electric cooking range, defendant retained the right of control over the work necessary to be done before the range could be supplied with electric current to serve the purpose for which it was sold by defendant to plaintiffs.

It is well-settled that a corporation may act as agent for another, "and whether such relationship exists in any particular case *may be proved by circumstances, such as the relation of the parties and their conduct with reference to the particular subject matter dealt with.*" [National Plumbing Supply Co. v. Torretti (Mo. App.), 175 S. W. (2d) 947, 951.] (Emphasis ours.)

In Andres v. Cox, 223 Mo. App. 1139, 1146, 1147, 23 S. W. (2d) 1066, 1069, this court held that the right of control, or the want of it, is the crucial test of the existence or nonexistence of the relationship of independent contractor; and that whether or not the right of control existed is ordinarily a question of fact for the jury, and is usually arrived at by inference from the terms of the contract, the character of the employment, and all the relevant facts and circumstances. The court pointed out in said case that the right of control, or the want of it, is seldom fixed in express terms by the contract of employment, and said: "*even where there is a contract in writing,* which in express terms negatives the right of control, *it is not conclusive.*" [Andres v. Cox, *supra.*] (Emphasis ours.)

In Riggs v. Higgins, 341 Mo. 1, 106 S. W. (2d) 1, 3, our Supreme Court gave its approval to a test of the relationship of independent contractor which was applied by this court in Aubuchon v. Security Const. Co. (Mo. App.), 291 S. W. 187, 191, as follows:

"However, the principal test of the relationship (and the one to which the courts most often look for guidance) is the right of control reserved by defendant as to the mode of doing the work and as to the means by which the result is to be accomplished. In this connection *it is not the fact of actual interference with control, but the right to interfere that marks the difference between an independent contractor and an agent or servant."* (Emphasis ours.)

Defendant, for reversal of the judgment, relies on its Exhibit 4, and points out that Mr. Russell testified on cross-examination that he signed said exhibit in two places. From this viewpoint defendant earnestly insists that plaintiff, having testified to a given statement of facts, cannot create an issue for the jury by subsequently contradicting his previous statement unless some explanation is given for the contradiction; that Russell gave no such explanation, and that as a matter of law he is conclusively taken to have signed the agreement in both places, as he originally testified, and is bound thereby. Defendant cites Steele v. Kansas City Southern R. Co., 265 Mo. 97, 175 S. W. 177, l. c. 181, in support of this contention. This point is of such vital importance in determining whether or not plaintiffs made a case for the jury that we deem it necessary to set out here Mr. Russell's testimony.

The record shows that while Mr. Russell was testifying on cross-examination the purported agreement marked "defendant's Exhibit 4" was shown to him and the following occurred:

"Mr. Russell (continuing): The exhibit marked 'Defendant's Exhibit 4' is permission for the electric company to install the electric wires for the operation of the range.

"(Witness reads said exhibit from the beginning through the third paragraph.)

"(The witness continuing:) I signed my own signature, 'Ralph V. Russell,' underneath that.

"(The witness continues reading from Defendant's Exhibit 4:) 'The following to be signed by range purchaser after the installation is completed and the range is in operation,' that was signed before not after.

"(Witness reads from Defendant's Exhibit 4:) 'The range, terms of payments therefor, and installation of wiring made by the above Dealer are entirely satisfactory to me.'

"Q. Who wrote that underneath there? A. It is his signature, maybe.

"Q. Purports to be that of Ralph V. Russell. A. I did.

"Q. You did? A. Yes, sir. That was done before the wiring.

"Witness excused)."

At the argument in this court counsel for plaintiffs admitted that the words in parenthesis in the above cross-examination of Russell, "(Witness reads said exhibit from the beginning through the third

paragraph),'' mean that Russell read said exhibit aloud from the beginning through the third paragraph.

After Russell was excused from the stand at the trial, a deposition of plaintiffs' son was read into evidence by plaintiffs' counsel. Thereupon Mr. Russell was recalled and testified on redirect examination as follows:

"Q. I will hand you paper here marked 'Defendant's Exhibit 4' and ask you whether your signature appears on that? A. Before he signed.

"Q. Just yes or no, does your signature appear on that? A. At the bottom.

"Q. How many times does your signature appear on that? A. Once.

"Q. You signed this one time? A. Yes, sir.

"The next time I saw this paper after the day I signed it was today. 'Lester Wright to wire, by customer' was written in my presence by Mr. Reynolds. I saw it written. That was written after I signed it because I argued about signing it. On this line here 'County Elect. and Gas Appl.'—that was not there when I signed it at the bottom. I did not at any time see that written there. It was not there at the time I signed this paper.

"Q. Just to make sure, I will point to where it says Ralph V. Russell, on this line, indicated by the word 'Owner,' did you sign that? A. I did not.

"(Witness excused.)"

It must be remembered that the signature "Ralph V. Russell" appears in two places on defendant's Exhibit 4, and that the witness was being interrogated as to both said signatures. The signature on the lower part of said exhibit is separated from the signature on the upper part thereof by a line extending clear across the document from side to side. The signature on the lower part of the document is unimportant for it merely attested that the range, terms of payment, and installation of the wiring were satisfactory to the person signing as the "Occupant of Premises." Furthermore, Russell admitted that he did sign the lower part of the document. The dispute arises as to whether or not he signed the upper part of said document which contains the agreement stating that the "Dealer or Electrical Contractor making this wiring installation is not the agent or employe of Union Electric Company of Missouri and that said Company is not responsible for nor does it assume any liability on account of or in connection with the work done or to be done by the Dealer, Electrical Contractor or their agents or employes."

That portion of Russell's testimony set forth above, which was given immediately prior to his being excused from the stand, refers to a signature as "underneath that." The record does not show which of the two signatures was referred to by the words "under-

neath that." It is true that Russell used the words "underneath that" after he had read the three paragraphs in the upper part of the Exhibit, but that does not conclusively show which signature on the document he was referring to at that time. One signature appears "underneath" the upper part of the document, and the other signature appears "underneath" the lower part, so that when Russell said: "I signed my own signature 'Ralph V. Russell' underneath that," without any further identification of the part of the document he was referring to, the most that can be said for such testimony, on the record before us, is that it left the matter in doubt. However, on redirect examination, all doubt as to his meaning was explicitly cleared up when he was asked, with reference to the whole exhibit: "Q. How many times does your signature appear on that?", and he answered: "Once", and further testified: "Q. You signed this one time? A. Yes, sir." His meaning was made still more positive, certain and unequivocal by the testimony which immediately followed:

"Q. Just to make sure, I will point to where it says Ralph V. Russell, on this line, indicated by the word 'Owner,' did you sign that? A. I did not."

The word "Owner" appears only under the signature on the upper part of the exhibit.

We are of the opinion that Russell's testimony cannot properly be said to have been contradictory—that in one place he said he did sign the upper part of the exhibit and in another he said he did not sign that part of it. On the contrary, we think the record shows that his testimony on cross-examination, which is above set forth, was obviously confused, indefinite and uncertain, but that upon re-direct examination it was made clear, specific, definite and certain. It will be noted that on cross-examination Russell's attention was not directed to the upper part of the exhibit and the lower part thereof, respectively, when he was being asked about the signatures "underneath that," nor did he at any time testify that he signed the exhibit on the upper part thereof over the word "Owner." If he had testified on cross-examination that he did sign the upper part of the exhibit, or that he had signed it over the word "Owner," and then on re-direct examination had denied that he had thus signed it, without any explanation for the change in his testimony, we would then have a situation similar to that in the case of Steele v. Kansas City Southern R. Co., *supra.*

Russell's testimony, as we view it, does not come within the doctrine of the Steele case, *supra.* In that case the plaintiff therein testified on his first examination that, without stopping, looking or listening, he stepped onto the railroad tracks of the defendant company and was immediately struck by defendant's train. After so testifying the plaintiff was excused as a witness without any intimation by him or his counsel that he would be used further. There-

after, another witness for plaintiff was heard and the court adjourned until the next morning when, after two other witnesses were called and had testified for plaintiff, plaintiff again took the stand in his own behalf and gave testimony that he got on defendant's track and walked east thereon for two hundred feet, and after being on the track for two miutes was struck by defendant's train and injured. It will be noted that the last-mentioned testimony diametrically contradicted that which he had given the day before, without giving any explanation whatsoever for such a glaring reversal of his first testimony. Furthermore, there was nothing in the record in said case to indicate that the testimony given on plaintiff's second appearance was for the purpose of correcting mistakes or errors, or to clear up doubtful or confusing matters in his testimony given on his first appearance.

We have no such situation in the case at bar as the court passed on in the Steele case, *supra*. The holding by the court in that case that the plaintiff's testimony unfavorable to his cause constituted a judicial admission and was binding against him, in the absence of a reasonable explanation of mistake, was a sound and just ruling clearly applicable to the facts in that case, but it has no application to the facts in the case at bar. The question, therefore, of whether Russell ever signed the agreement absolving defendant from liability and designating the "County Electric & Gas Appl. or their agents" to install the wiring, was for the jury to determine.

It will be recalled that Russell also gave testimony concerning a conversation between him and defendant's representative Reynolds. Russell had just testified how Reynolds had talked him into signing a contract to buy an electric range, which contract two days later was canceled. Thereupon Russell further testified:

"Q. Did you meet him after that? A. He came back, I don't know whether it was the next day, but a day or so after the Union Electric truck came out to change the transformer on the pole in the highway, and while they were doing that, Reynolds drove in the yard to ask why we cancelled the stove. I said we didn't see fit to take or use it. I said, 'I am afraid it will make too much of an electric bill.' He said, 'We will put that stove in and I promise you.'—

"Mr. Snider: If the Court please, I object to all this conversation. I don't see the relevancy of it.

"The Court: Sustain the objection."

It will be observed that the objection came after the witness had testified as quoted above, and that there was no motion to strike out, nor was there any motion to require the jury to disregard any part of the answer. Defendant contends, however, that the ruling by the court sustaining the objection must be treated as equivalent to sustaining a motion to strike out the objectionable testimony, because such testimony was an improper and unresponsive answer to a proper

question. In support of this contention defendant relies mainly on Weddell v. Metropolitan Street Ry. Co., 113 Mo. App. 680, 88 S. W. 765.

The above quoted excerpt shows that the question asked was a proper one, and that the entire first sentence of the answer of the witness was responsive to the question. The second sentence of the answer: "I said we didn't see fit to take or use it," was not responsive to the question asked but constituted a part of a conversation. Then came the third sentence of the answer: "I said, 'I am afraid it will make too much of an electric bill.'" This also was not responsive to the question but was a further narration of a part of a conversation. Then came the fourth and last sentence of the answer: "He said, 'We will put that stove in, and I promise you,'" whereupon an objection was made for the first time. No objection was made until after the unfavorable part of the answer was given in the fourth sentence: "We will put that stove in, and I promise you," although defendant knew from the two sentences immediately preceding that sentence that the matter being narrated by the witness was not responsive to the question that had been asked.

It is clear that defendant was not taken by surprise through an unexpected and unresponsive answer to a proper question whereby the court could treat the objection as equivalent to a motion to strike out the unresponsive matter. Furthermore, the ground of the objection : "I don't see the relevancy of it," was not a proper ground of objection. The testimony in the last sentence of the answer, although not responsive to the particular question, was nevertheless relevant to the issues being tried. The ground stated for the objection was so general that it amounted to no ground of objection at all. Before evidence can be excluded upon the ground that it is irrelevant, it must appear to be irrelevant beyond doubt. [Luechtefeld v. Marglous (Mo. App.), 151 S. W. (2d) 710, 713, 714.] The court erred in sustaining the objection.

The Waddell case, *supra*, relied on by defendant, is not controlling here because our Supreme Court has ruled to the contrary in Steeley v. Kurn, 348 Mo. 1142, 157 S. W. (2d) 212, 213, and Radler v. St. Louis-San Francisco R. Co., 330 Mo. 968, 51 S. W. (2d) 1011. In the two last-mentioned cases the Supreme Court held that the sustaining of an objection to a question does not have the effect of striking out an answer of a witness, "absent a motion to strike out such answer." It is true that the general rule prohibits a winning party from urging a review of errors against him for the purpose of modifying or changing a judgment which was in his favor, but there is an exception to that rule which permits the winning party to attack erroneous rulings of the trial court *for the purpose of sustaining the court's judgment.* [St. Charles Savings Bank v. Denker, 275 Mo. 607,

205 S. W. 208.] (Emphasis ours). The exception to the rule is applicable here.

We hold that the testimony of Russell, that defendant's representative Reynolds said to him: "We will put that stove in" ("We," meaning, of course, Reynolds' employer, the defendant company), remained in the record to be considered along with all the other evidence in the case.

There is no evidence whatsoever that either Mr. or Mrs. Russell employed anyone to do the wiring work necessary to connect the range with defendant's electrical current. On the contrary, Mr. Russell testified explicitly that he did not employ or talk to anyone about installing the range except defendant's agent Reynolds who sold him the range. On the other hand, there is defendant's admission that it paid $36 for the wiring installation work that was done by Hoefer, but the evidence shows that before doing so defendant had its inspector check over oll the wiring and make a report to it in writing. Also, there is the evidence that before the wiring job was paid for the Fire Prevention Bureau inspected it and made its report to defendant "for final O. K." There is also the "check list" and Hoefer's testimony concerning it. From these the jury could reasonably conclude that the "check list" was furnished by defendant to Hoefer to be used as a directive for doing the work according to the eleven "must" instructions contained therein. From all of said testimony and the "check list" the jury could also find that Hoefer signed the "check list" as follows: "Co. Elec & Gas Appl Co. By G. H. Hoefer," and "sent it out" to defendant to show defendant that the work had been done according to its instructions.

The fact that defendant sold plaintiffs the range which had to be connected with defendant's electric current in order to be of any use, and the further fact that defendant, being a purveyor of electricity, fully understood the dangerous nature of electrical current, were circumstances to be taken into consideration by the jury, along with all the other circumstances shown, in determining from all the evidence whether or not defendant selected its own agent to do the wiring work and thereby, for its own purposes of care and safety, retained the right of control over the doing of the work. Of course, if the work was done according to defendant's instructions the jury could find that defendant had the right of control of the manner of doing the work.

It will also be recalled that the original contract for the purchase of an electric range was canceled by plaintiffs and that a second contract for such purchase was made. Neither of said purchase contracts was introduced in evidence by defendant and we therefore do not know the dates thereof. There is no evidence to show whether defendant's Exhibit 4, which is dated "5-6-41" was signed in connection with the first range purchase contract, which was canceled,

or in connection with the second contract of purchase. If defendant's Exhibit 4 was signed along with the first contract for the purchase of a range, then, of course, the cancellation of that first purchase contract effected a cancellation of defendant's Exhibit 4, which was made in connection therewith. Furthermore, it appears from the evidence that the name: "County Elec. & Gas. Appl." was written in on the line provided for the name of "Electrical Contractor" after Mr. Russell is purported to have signed said exhibit, although the document contained on its face words written there as a marginal memorandum by defendant's agent Reynolds, as follows: "Lester Wright to wire by customer. . . . Reynolds will see Wright." The record is silent as to whether Reynolds ever saw Lester Wright about the wiring job. However, Mr. Russell was emphatic in stating that the blank space for the name of the "Electrical Contractor" was not filled in when he signed the lower part of the exhibit, and that the next time he saw the exhibit after he signed it on the lower part was when it was shown to him by defendant's counsel at the trial. These were. questions of disputed facts which, along with all the other questions of fact to which we have referred, were for the consideration of the jury.

Last, but not least, the signatures on defendant's Exhibit 4—the one on the lower part which is admitted to be Russell's, and the one on the upper part which was denied by him, when compared with each other, show dissimilarities. Furthermore, a comparison between the admittedly genuine signature on the lower part of said exhibit with other admittedly genuine signatures of Russell on additional exhibits, introduced in evidence for purposes of comparison, show similarities. These similarities and dissimilarities were matters for the jury's consideration.

From a consideration of the whole record, in the light of the long established rule that on demurrer to the evidence we must take plaintiffs' evidence as true and give them the benefit of all reasonable favorable inferences arising from all the evidence, we are of the opinion there was substantial evidence from which the jury could properly' find that in the performance of the work Hoefer was subject to defendant's right of control, and in that respect was defendant's agent for whose negligence defendant was liable. We therefore hold that the court did not err in overruling defendant's demurrer to the evidence.

Defendant contends that the trial court committed reversible error in giving and reading to the jury, at the request of plaintiffs, Instruction No. 1. The first portion of said instruction told the jury that if they found and believed from the evidence "that on or about the —— day of May, 1941, plaintiffs purchased an electric range mentioned in the evidence from and to be installed by the defendant within the premises mentioned in the evidence . . . " Defendant

contends that the above quoted language submitted an issue which was immaterial and foreign to the real issues in the case and was without support in the evidence. We cannot agree with defendant's view on this point.

Defendant's position at the trial was that it had nothing whatsoever to do with the installation of the range or the electric wires; that the work of installation was done by an independent contractor over whom it had no control or right of control.

Plaintiffs' petition alleged that it was defendant's duty to install, and that it did install, the range in question. Plaintiffs' evidence was to the effect that defendant's salesman Reynolds told Mr. Russell: "We will put that stove in." That testimony was not denied by defendant, but under the general denial in its answer there was presented a question to be determined by the jury, and we think it cannot properly be said to be immaterial. However, the instruction contained additional facts which were required to be found by the jury as a prerequisite to a verdict for plaintiffs. These facts were joined with the first portion of the instruction above quoted by the conjunction "and."

Since defendant does not contend that the instruction did not submit to the jury all the material issues in the case, we are unable to perceive how the inclusion of the language complained of could have prejudiced defendant in any degree. It merely placed on plaintiffs an unnecessary burden.

Defendant's further contention, that said instruction was erroneous in submitting to the jury fact issues which were without support in the evidence, has been disposed of by our ruling on defendant's demurrer to the evidence. Defendant agrees with this view, as shown by the statement in defendant's own brief that: "With regard to this particular matter, the determination of Point I of this brief is determinative of our contention here."

Defendant next complains that Instruction No. 1 was reversibly erroneous in submitting to the jury issues broader than and beyond the scope of the evidence. Defendant points out that plaintiffs' petition, after alleging that defendant negligently installed the range cable in question, in that it caused the insulation thereof to be injured, broken and cut by sharp-edged staples, further alleged that: "on or about the 3rd day of February, 1942, as a direct and proximate result of defendant's negligence, as aforesaid, a short circuit did develop in said wire, and caused plaintiffs' dwelling to be ignited, and the same . . . was thereupon consumed by fire . . ." Defendant insists that the evidence does not support plaintiffs' theory that the negligent damage to the range cable caused a short circuit which ignited plaintiffs' dwelling, but that, on the contrary, plaintiffs' own expert Osborn testified:

"When this cable started to burn it didn't produce a short. The only way you can produce a dead short circuit is to touch two wires mechanically. The passage of current was simply a leak, and the leak increased in magnitude, in quantity sufficient to begin to burn this insulation. After it burned the insulation away the exposure of the surface would carry more electricity, the heat became greater, with the result that it burned the insulation from the wire. After sufficient insulation was burned from the wire the heat is sufficient to burn the conductor.

"Q. That makes a dead short? A. No. If there had been a dead short on these wires the sixty-ampere fuse would have immediately blown . . . and there wouldn't have been any fire."

The instruction, in the respect now under consideration, submitted to the jury for its finding the question of whether "the injured, broken or cut insulation permitted the electric current to flow from one wire to another within said cable, and that said electric current thus passing between said wires did on the 3rd day of February, 1942, cause heat to be generated within said cable at said point . . . ."

Defendant urges that the process mentioned in the last above quoted part of the instruction is not a "short circuit," as charged in the petition; that "a leakage of current" is an entirely different theory from a "short circuit"; and that defendant having been charged with a "short circuit" cannot be found negligent in causing a leakage of current. The record does not show that Mr. Osborn said that a "short circuit" never did occur. It shows that Mr. Osborn said: "When the cable *started* to burn it didn't produce a short." (Emphasis ours.) Osborn, however, explained in his testimony that a "short" did develop later and that "the fire was caused between the time this short developed and the time that a fuse finally blew"; that there was no "dead short circuit" because that is produced by mechanically bringing the wires together. The point thus raised by defendant relates to the highly technical difference between a "short circuit" and a "dead short circuit," but a careful reading of Mr. Osborn's testimony lends no support to defendant's contention. Furthermore, if there could be said to be any variance, we think it related to matters of evidence rather than to the ultimate issuable facts in the case.

The alleged negligence of defendant in puncturing the range cable with iron staples while it was being installed was the gravamen of plaintiffs' cause of action and was the direct cause of the damage that ensued, and although the instruction did not follow the exact language of the petition in this respect, it cannot, in our opinion, be said to have broadened the real issues in the case. There is no substantial variance between the charge of negligence in the petition and the facts hypothesized in the instruction and required to be found by the jury as a prerequisite to a verdict for plaintiffs. [See Morris v.

Atlas Portland Cement Co., 323 Mo. 307, 336, 19 S. W. (2d) 865, 867. See also Mitchell v. Wabash R. Co., 334 Mo. 926, 936, 937, 938, 69 S. W. (2d) 286, 290, 291, and the cases therein discussed.]

We find no reversible error in the record and the judgment should be affirmed. It is so ordered. *Anderson, J.,* concurs; *Hughes, P. J.,* not sitting.