**RUSK FARMS, INC., Joe C. Jurgensmeyer and James Huhmann, Plaintiffs-Respondents,**

v.

**RALSTON PURINA COMPANY, Defendant-Appellant.**

No. 47528.

Missouri Court of Appeals,
Eastern District,
Division Eight.

Feb. 13, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Denied
April 9, 1985.

Application to Transfer Denied
May 29, 1985.

Hamp Ford, Columbia, for defendant-appellant.

Larry M. Woods, Columbia, for plaintiffs-respondents.

PUDLOWSKI, Presiding Judge.

Ralston Purina Company appeals from an adverse judgment arising out of "turkey firm purchase contracts" and from a claim for damages for the tort of malicious interference with business relationships. We affirm in part and reverse in part.

The initial dispute arises out of a provision in the agreement between Ralston Purina Company (Ralston) and respondent, Rusk Farms, Inc. Ralston is a corporation engaged, among other commercial activities, in the production of feeds, tonics and medicines for poultry and animals, including turkeys. Rusk Farms is a Missouri corporation. The sole shareholders, as well as the officers and board members of the corporation, are Jim Huhmann (Huhmann) and Joe Jurgensmeyer (Jurgensmeyer).

Under the agreement dated September 20, 1974, titled "Ralston Purina Company Firm Purchase Turkey Agreement California, Missouri Plant 1975 Crop Year," Rusk Farms agreed to purchase from Ralston, 78,000 turkey poults to be raised in the Syracuse/Stover, Missouri area commencing on or about December 1, 1974. The purchase price for each flock of turkeys was to be determined as stated in Firm Purchase Agreement as follows:

> Compute the weighted average price for feed for each flock as determined by Rusk Farm's and Ralston's records by multiplying the pounds used of each feed by the established f.o.b. truck mill bulk cash price (any cash discount or load allowance is not included in the cash price) to secure an overall weighted average per ton price. Prices used would contain no medicants. The cost of any medication, even though mixed in the feed, must be removed in establishing the mill price.

The printed agreement prepared by Ralston provided for termination by written notice by either party to the other. Upon termination, the agreement was to remain in effect after receipt of notice only with

respect to flocks on feed at the time of receipt of the notice. Finally, the agreement provided that the written contract constituted the entire agreement between the parties.

Prior to the execution of the agreement, both parties met in Sedalia, Missouri to discuss the conditions. At that time, Tom Hagen, Director of Turkey Operations, Checkerboard Farms Division, explained that the 1975 agreement was making a change with respect to the method of treating the pricing of birds as compared to prior years. Hagen explained that respondents would not get the cash discount and load allowance as had been provided in previous agreements.

Upon delivery of the poults, Jurgensmeyer and Huhmann allocated the birds among themselves. In December 1974, a few days after execution, Ralston and Rusk Farms orally amended the amount of turkeys to be grown. The total number of poults accepted by Rusk Farms was 87,000.

The first flock of grown turkeys was killed April 16 and April 25, 1975. Prior to the flock being killed, Huhmann requested a change in the contract. Huhmann inquired upon Royce McEver, an employee of Ralston, whom Jurgensmeyer and Huhmann had been dealing with, whether Rusk Farms could keep the cash discount and load allowance. McEver did not have authority to approve the change, however, he informed Huhmann the change had been approved. McEver never stated where he received authority to make the change.

When payment from the first flock was received, it did not include the cash discount and load allowance. In fact, Ralston, without approval of respondents, had computed the purchase price by lowering the average feed price by a cash discount and load allowance.

Following the receipt of payment for the first flock, respondents and Ralston entered into discussions concerning Ralston's taking credit for the cash discount and load allowance contrary to the terms of the written agreement and the alleged modification by McEver. When the discussions broke down, Jurgensmeyer and Huhmann notified Ralston that they were taking the remaining birds off the agreement. At that time Jurgensmeyer had 24,000 hens still growing in the field and Huhmann had 23,000 toms.

On June 16, 1975, Kent D. Kerr, Division Vice President and Director of Checkerboard Farms Division of Ralston Purina, sent a letter to nine turkey processors in the central United States. The letter was as follows:

This is to advise you that Joe Jurgensmeyer, or his wholly owned corporation, Rusk Farms, Inc., may attempt to sell you approximately 24,000 hen turkeys for processing this week or shortly thereafter and (or) approximately 23,000 tom turkeys for processing during the last of July. These turkeys have been contracted for sale to us and shackle space has been reserved for these turkeys at the Cargill Plant in California, Missouri. We would appreciate it, therefore, if you would not purchase these turkeys or at least notify us before doing so.

About one-half of the hens are located at the Arnold Holstein Farm, Rt. 135, Stover, Missouri and the other half at the Charles Boyer Farm, Rt. 35, Stover, Missouri. The toms are located at the Hubbard Hill Farm, Syracuse, Missouri.

Thank you very much for your cooperation in this matter.

Sincerely yours,

Subsequently, Jurgensmeyer and Huhmann brought suit for the cash discount and load allowances withheld by Ralston for all turkeys delivered and killed pursuant to the turkey firm purchase agreements. Additionally, Jurgensmeyer claimed damages resulting from Ralston's failure to deliver 10,000 hens which were part of the original agreement between Ralston and Rusk Farms. Jurgensmeyer and Huhmann also sought actual and punitive damages as a result of Ralston's letter to various turkey processors. The trial court granted Ralston's motion for directed verdict in regard to Ralston's failure to

deliver 10,000 hens pursuant to the agreement. The jury awarded Jurgensmeyer $1,250, $900 and $2,458 on the turkey firm purchase agreements. Huhmann was awarded $3,963. On the claim for malicious interference with business relationships, the jury awarded Jurgensmeyer $500,000 actual damages and $200,000 punitive damages. The jury also found for Huhmann awarding him $25,000 actual damages and $50,000 punitive damages.

Ralston raises eight points on appeal. First, Ralston argues the trial court erred in submitting Count V of plaintiff's petition, tort of malicious interference with business relationship, because: (a) as a matter of law, Ralston was justified in writing the letter and (b) the evidence failed to establish a submissible jury issue on whether Ralston's letter caused a breach or termination of any business relationship or expectancy of any relationship. Second, on the issue of damages for the tort of malicious interference with business relationships: (a) respondents failed to plead and prove special damages and (b) the evidence pertaining to lost profits was not supported by facts and figures showing a reasonable basis and method of calculation. Third, respondents' claims based on the oral waiver of the written contract terms concerning the cash discount and load allowance were barred by the statute of limitations. Fourth, plaintiffs Joe Jurgensmeyer and James Huhmann were not real parties in interest. Fifth, the trial court erred in admitting oral evidence as to modifications of the written agreement in violation of the Statute of Frauds and the Parole Evidence Rule. Sixth, the trial court erred in admitting into evidence purported statements of Royce McEver constituting hearsay. Seventh, the trial court failed to instruct nor was any instruction offered by plaintiffs covering the issue of agency. Eighth, the trial court erred in giving instructions 10 and 13 because the instructions failed to submit for jury determination whether the contract had been modified or waived. Ralston alleges numerous errors pertaining to respondents' award for damages based on the oral waiver of the written contract terms concerning the cash discount and load allowance.

First, Ralston contends Jurgensmeyer and Huhmann were not parties to the agreement and as such were not real parties in interest and had no right to maintain claims. The agreement which formed the basis for the case at bar was entered into between Rusk Farms, Inc. and Ralston. However, respondents' Second Amended Petition alleged that Rusk Farms, Inc. was the duly authorized agent and contracting party on behalf of Jurgensmeyer and Huhmann.

It is well established that a corporation, as well as a natural person, may act as agent for another. Whether such relationship exists may be proved by circumstances, such as the relation of the parties and their conduct with reference to the particular subject matter dealt with. *Russell v. Union Electric Co. of Missouri*, 238 Mo.App. 1074, 191 S.W.2d 278, (1945).

The record shows Royce McEver, appellant's agent, suggested establishment of Rusk Farms, Inc. for Ralston's benefit. His rationalization was that it was more convenient for Ralston to have one dealership to handle both accounts rather than deal with two individuals. Respondents concurred and incorporated. Further, Jim Kelly, former director of Ralston's poultry production, testified by deposition, that he was aware that Jurgensmeyer and Huhmann were separately contracting for turkeys through Rusk Farms, Inc. We conclude that there is sufficient evidence to show that Jurgensmeyer and Huhmann were the real parties in interest. Appellant's point is denied.

Ralston next contends respondents' claims concerning the cash discount and load allowance is barred by the Statute of Limitations under Section 400.2–725 RSMo 1969 or Section 516.120 RSMo 1969. Section 400.2–725 RSMo 1969 provides that "an action for breach of any contract for sale must be commenced within four years after the cause of action accrued." Section 516.120 RSMo 1969 provides that all "ac-

tions upon contracts ... express or implied, except those mentioned in Section 516.110 ..." must be brought within five years after the cause of action accrued. Section 516.110 RSMo 1969 provides that "an action upon any writing" must be brought within ten years after the cause of action accrued.

Respondents' original petition was filed September 10, 1975 and alleged a cause of action for breach of the contract between Rusk Farms and Ralston. A second amended petition was filed November 16, 1982. This amended petition alleged modifications or waiver of the original contract and a breach by Ralston.

It is not disputed, regardless of which statute applies, that the limitation for respondents' cause of action had run by 1982. Respondents, however, rely on Rule 55.-33(c) and contend that the second amended petition relates back to the date of the original pleading in 1975 and thus avoids the bar of the statute. Rule 55.33(c) provides in pertinent part:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading....

Ralston argues that respondents' claims did not relate back because the second amended petition included the pleading of the original written agreement but then added modification and waiver with respect thereto. Ralston misinterprets the application and meaning of Rule 55.33(c).

> [T]he function of any amendment to a petition is to cure a lapse in the pleading but without changing the original cause of action; and when the amendment is for this purpose it relates back, according to Rule 55.33(c), to the date on which the first petition was filed. If the amended pleading, however, requires proof of ultimate facts different from those necessary to sustain the original claim and thus adds a new cause of action, the amendment does not relate back

so as to save the action from the bar of limitations.

*Welch v. Continental Placement, Inc.,* 627 S.W.2d 319 (Mo.App.1982); *Briggs v. Cohen,* 603 S.W.2d 20 (Mo.App.1980).

▇ Applying the standard set forth in Rule 55.33(c), we hold respondents' second amended pleading related back. Additional facts will not necessarily prevent an amended petition from relating back. To reach this result, the additional facts must also create a new cause of action. *Welch.* Respondents' original petition is a claim to recover damages for breach of a contract. The amended petition also dealt with the same transaction and alleged the same cause of action. The petition related back and thus avoided the bar of the Statute of Limitations.

▇ Next, Ralston alleges trial court error in admitting oral evidence as to the modification of the written contract as improper under the statute of frauds.

In analyzing the case at bar, we find the ultimate fact question was not whether the written contract had been modified or waived but whether Ralston had breached the contract by lowering the average feed price by the amount of the cash discount and the load allowance. The written contract provided that the purchase price would be determined by computing "the weighted average price for feed ... by multiplying the pounds used of each feed by the established f.o.b. truck mill bulk cash price." Any cash discount or load allowance was not to be included in the cash price. Respondents' petition alleged, and the evidence proved, that Ralston deducted the cash discount and load allowance to compute the overall weighted average. This was contrary to the express written terms of the contract that provided "any cash discount or load allowance is not included in the cash price."

While this court acknowledges the business practice of "cash discounts" and "load allowances" no evidence was presented to this court by either party of the proper method of payment for these allowances.

Ralston argues they were entitled to the discount and load allowance and as such were justified in deducting said discount and allowance from the bulk mill cash price. Assuming arguendo that Ralston's statement is correct and they were entitled to the cash discount and load allowance, our interpretation of the written contract patently precludes Ralston from deducting the discount and allowance. Ralston should have paid the full cash price and then requested payment for the discount and allowance. While the proper packing industry practice may have been to allow the discount and allowance to be deducted from the cash price before payment, there is no evidence of this practice before this court. As such, the terms of the written contract must prevail. Ralston breached the contract by deducting the cash discount and load allowance. As a result, such error, if any, in admitting testimony regarding the oral waiver or modification was harmless.

Ralston also objects to the admission of respondents' testimony of statements made by Royce McEver. For the reasons previously mentioned, any error in their admission is harmless. However, in this instance no error occurred.

Respondents had requested a change in distribution of the cash discount and load allowance. McEver told respondents he didn't think they could have it, but he would try. Subsequently, McEver informed respondents they could have the cash discount and load allowance. However, McEver never informed respondents where the authority for the change came from.

■ Respondents acknowledge McEver did not have the authority to change the terms of the contract. Respondents, however, argue that McEver had the authority to pass communications from Ralston to them. An admission of an agent may be received in evidence against his principal, where the agent, in making the admission, was acting within the scope of his authority and the transaction or negotiation to which the admission relates was pending at the time it was made. *State ex rel. S.S. Kresge Co., v. Shain*, 340 Mo. 145, 101 S.W.2d 14 (1936). Thus, the issue presented for our review is whether or not Royce McEver was acting within the scope of his authority as an agent for Ralston.

■ A review of the facts reveal that McEver was acting within his authority. McEver negotiated the agreement between Tom Hagen and respondents. Jim Kelley stated McEver conveyed communications between the turkey growers and Checkerboard Farms. Finally, McEver testified that he was the only person from Ralston who communicated with Jurgensmeyer and Huhmann before the dispute arose.

■ Where a principal has created an appearance of things that it causes a third person reasonably and prudently to believe that a second person has the power to act on behalf of the principal, the principal is thereby bound to the third party who relies upon the appearance so created. In such a case, the appearance of power is the equivalent of expressly conferred power insofar as third persons are concerned. *Trail v. Industrial Commission of Missouri, et al.*, 540 S.W.2d 179 (Mo.App.1976). Ours is such a case. While respondents knew McEver did not have authority to approve a change in contract terms, McEver was the person to inquire about a change. All communications from respondent to Ralston were channeled through McEver. Ralston created the impression that Royce McEver could deliver an inquiry to the proper authority and relay an answer. If any loss occurs by reason of the acts of the agent, the loss must fall upon the person whose conduct caused the mistake. *Walker v. Multi-Wood Products, Inc.*, 581 S.W.2d 617 (Mo.App.1979). As stated earlier, Ralston was responsible for creating the situation. The trial court did not err in admitting into evidence admissions made by Royce McEver.

On the same issue of agency, Ralston alleges error by the court in failing to submit to the jury Missouri Approved Instruction 18.01. MAI 18.01 directions state

that "where a defendant master or principal is being sued and he has denied agency of the alleged servant or agent, paragraph First in the verdict directing instructions shall be in the following suggested form:

First, the driver Jones (was an employee of Ajax and) was operating the (Defendant) motor vehicle within the scope and course of his (employment by) (agency for) (Defendant's name) (at the time of the collision).

The Notes on Use to MAI 18.01 further state that "when the issue of agency is submitted, the appropriate definition must also be submitted."

■ While Ralston denied in its answer that McEver was acting within his authority the word denial means more than a mere perfunctory or ostensible denial in the defendant's answer. *Young v. Frozen Food Express, Inc.*, 444 S.W.2d 35, 40 (Mo.App. 1969). Further, where plaintiff's evidence of agency was not refuted by other evidence, agency is a question of law and need not be hypothesized in plaintiff's verdict director. *Cline v. Carthage Crushed Limestone Company*, 504 S.W.2d 102 (Mo. 1973); *Bowers v. S–H–S Motor Sales Corporation*, 481 S.W.2d 584 (Mo.App.1972).

■ It is not disputed that McEver never had authority to approve a change in the contract terms. However, the authority in question was McEver's communication of Ralston's consent to a waiver of the cash discount and load allowance. Ralston has presented no evidence to refute McEver's authority.

■ On the last issue pertaining to the cash discount and load allowance, Ralston alleges error because the jury instructions tendered by respondents failed to submit for jury determination the issue of whether the contract had been modified or waived. As stated previously, the ultimate fact question was whether Ralston breached the written contract by failing to pay the contract price for the birds, not whether the contract had been modified or waived. No error resulted by the trial court in not submitting a jury instruction on the issue of waiver.

In regard to the tort of malicious interference with business relationships, Ralston contends the trial court erred in not granting its motion for a directed verdict because it had a legal privilege to protect its economic interest in the turkeys under the contract. We disagree.

■ The basic elements necessary to establish a prima facie case of malicious interference with a business relationship are set out by our Supreme Court as follows:

(1) A contract or a valid business relationship or expectancy (not necessarily a contract);

(2) Defendant's knowledge of the contract or relationship;

(3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship;

(4) The absence of justification; and

(5) Damages resulting from defendant's conduct.

*Fischer, Etc. v. Forrest T. Jones & Co.*, 586 S.W.2d 310, (Mo. banc 1979). In conjunction with the elements in *Fischer*, Ralston cites *Downey v. United Weatherproofing, Inc.*, 253 S.W.2d 976 (Mo.1953) for the principle that the right of a party under a contract is a protectable interest. We agree with *Downey*. However, the evidence showed, and the jury found, that Ralston breached the terms of the contract by failing to pay the contract price of the birds. As a result of Ralston's breach, it lost its protectable interest. Therefore it had no justification for preventing respondents from selling the turkeys on the open market. Absent justification, Ralston is subject to liability resulting from its actions.

On this point, Ralston contends respondents failed to establish any connection between the letters sent to the area's turkey producers and their business relationships. In review, we must accept as true all evidence and permissible inferences favorable to the prevailing party and disregard any

contradictory testimony. *S.G. Adams Printing & Stationery Company v. Central Hardware Company*, 572 S.W.2d 625 (Mo.App.1978). However, the evidence must show that "but for" the act of Ralston writing the letters, respondents would have done future business with the recipients of the letter by selling the turkeys to any one or more of them. *Tri-Continental Leasing Co. v. Neidhardt*, 540 S.W.2d 210 (Mo.App.1976). We review the evidence as it pertains to the individual respondents, Joe Jurgensmeyer and Jim Huhmann.

### JURGENSMEYER

Ralston mailed the letter to Louis Rich Food Corp., Empire Foods, Inc., Land-O-Lakes, Inc., Barron Turkey Processors, Levin Bros. Poultry Company, Banquet Foods Corp., Joe Morrow Foods, Bartley Brand Foods, Inc. and Armour Foods. Respondent Jurgensmeyer, testified that he did not sell any turkeys to all of these companies. By inference, Jurgensmeyer wishes to establish Ralston's letters as the cause of his discontinued business with all of them.

■■■■■ An inference is a deduction logically and properly drawn by reason from proven or admitted facts and cannot be predicated upon mere surmise or conjecture. *Hayes v. National Super Markets, Inc.*, 612 S.W.2d 819 (Mo.App.1981). Further, proof by circumstantial evidence must establish the desired information with such certainty as to cause it to be the more reasonable and probable of the conclusions to be drawn, and must rise above the stature of guesswork, speculation or surmise. *Jordon v. Robert Half Personnel Agencies of Kansas City, Inc.*, 615 S.W.2d 574 (Mo.App.1981). With this in mind, Jurgensmeyer has failed to prove, above mere speculation, that the letter written by Ralston interfered with any business relationship between him and Land-O-Lakes, Levin Brothers, Armour Foods and Joe Morrow Foods.

■■■ Jurgensmeyer testified he had only done business with Land-O-Lakes once before. Further, there is no evidence that Jurgensmeyer attempted to sell to Land-O-Lakes after 1975. The same rationale applies to Levin Brothers and Armour Foods. Jurgensmeyer has only sold turkeys to these companies once. As to Joe Morrow Foods, Jurgensmeyer has never engaged in any business relationship. The evidence fails to support the inference that Ralston's letter impaired a business relationship or expectancy of a relationship.

However, in regard to the other companies, Jurgensmeyer has met his burden. The evidence in light most favorable to Jurgensmeyer reveals a business relationship with Louis Rich beginning in 1970. While Jurgensmeyer continued to do business with Louis Rich after 1975, Louis Rich originally refused to purchase turkeys from him until he wrote a letter guaranteeing the turkeys to be delivered were not under contract. Jurgensmeyer also had to explain his side of the dispute to Louis Rich management.

Barron Turkey Processors had purchased turkeys from Jurgensmeyer every year since 1969. In 1975 Barron refused to purchase 12,000 turkeys offered for sale. Barron had never declined to purchase from Jurgensmeyer. Likewise, Jurgensmeyer had been selling to Bartley Brand Foods one to two flocks a year. In 1975, Bartley refused to purchase. The same was true for Banquet Foods and Empire Foods. Jurgensmeyer had sold to both companies on a number of occasions. Neither had ever refused to buy from him. In 1975, after receiving Ralston's letter, both companies declined all offers.

Lastly, Jurgensmeyer alleged that Ralston's letter interfered with his relationship with Swift Company. Swift was not a recipient of Ralston's letter. Phil Parrish, procurement manager for Swift Company, never saw the letter nor had any knowledge of the letter. Parrish did know of a "dispute" between Jurgensmeyer and Ralston. We conclude there is no evidence to establish the necessary elements of malicious interference with Swift.

Nevertheless, the evidence supported a finding of interference with Louis Rich, Barron, Bartley, Banquet and Empire Foods. The trial court correctly submitted the issue of causation to the jury and properly advised the jury in the burden of proof instruction that they could consider reasonable inferences derived from the evidence.

## HUHMANN

The evidence presented at trial revealed that respondent Huhmann dealt with two companies, Swift and Company and Louis Rich Foods. As stated earlier, the evidence does not support a finding of tortious interference in regard to Swift. With regard to Louis Rich, the evidence also does not support the jury's finding. We find that Huhmann first began to do business with Louis Rich in 1975. Louis Rich initially would place a limit on the number of birds they would buy from a grower. To increase the amount purchased, a grower had to build a relationship with the company. The evidence failed to show that Huhmann had established such a relationship.

■■■ However, the rule is that for every actionable injury there is a corresponding right to damages, and such injury arises whenever a legal right of plaintiff is violated. If there is no inquiry as to actual damages, or none appears on inquiry, the legal implication of damages remains and nominal damages are given. *Wente v. Shaver*, 350 Mo. 1143, 169 S.W.2d 947 (1943). Therefore, the jury award for $25,000 actual damages for the tortious interference with business relationships is improper and is vacated and $1 nominal damages is awarded. *Wente* 169 S.W.2d at 954.

Lastly, Ralston argues that respondents failed to plead and prove special damages and further failed to prove lost profits by a reasonable basis.

Respondent's second amended petition with respect to damages alleged:

That such letter thereby damaged the ability of the plaintiffs to market not only the turkeys previously designated for the defendant, but also other turkeys owned by plaintiff. Said letter has caused plaintiff severe, substantial and irrepairable damaged in the market; said letter reduced the plaintiffs' ability to sell its turkeys to turkey processing plants in the Central United States, and has caused and will cause in the future much expense and trouble ... constituted unlawful and torturous interference with plaintiffs of their market for the selling of their poultry and cause them irrepairable harm in the future and the relationship with such processing plants and commerce in general ... and the plaintiffs Joe C. Jurgensmeyer and James Huhmann have sustained damage in the sum of $1,000,000.00 by reason thereof.

■■■ Generally, loss of business profits must be specifically pleaded in tort actions. *Parsons Construction Company v. Missouri Public Service Company*, 425 S.W.2d 166 (Mo.1968). However, an "injury" as an invasion of a legally protected right may cause either general or special damages. If the former, no special pleading is required. If the latter, the pleading must set forth the factual matters that give reasonable notice of the nature and extent of the claim. *Porter v. Crawford & Company*, 611 S.W.2d 265 (Mo.App.1980).

■■■ In the case at bar, no special pleadings were required. Respondents alleged that the letter curtailed their ability to sell their turkeys and in addition it would continue to create additional expense. Evidence revealed that respondents were in the business of selling turkeys. They further alleged a tort which was the malicious interference with a business relationship. The evidence showed that their lost profits were the natural, necessary and logical consequence of respondents' inability to sell their turkeys.

■■■ We find respondent's petition for damages sufficient. With this holding, we address Ralston's next argument that the method of computating respondent's lost profits was erroneous. To establish loss of profits, respondents testified as to their net

profit per bird based on 1973, 1974 and prior years. Their computations were based on their personal knowledge of the income they received less costs such as poults, feed, lights, fuel, electricity, taxes and insurance. Such evidence is sufficient to provide a rational basis for estimating the amount of the lost profits. In proof of lost profits, the requirement is not absolute certainty, but only a sufficient factual base that the estimate of loss is not based on speculation and conjecture. *Swiss-American Importing Company v. Variety Foods Products Company,* 471 S.W.2d 688 (Mo.App.1971).

Ralston cites *Solari Furs v. United States,* 436 F.2d 683 (8th Cir.1971), for the proposition that respondents testimony on lost profits should have been excluded unless respondents' records were made available in court for examination. Ralston misinterprets *Solari Furs. Solari Furs* was a bankruptcy case where the federal government sought to recover income and excise tax from the sale of furs. All the records of the bankrupt were in court, as well as summaries in the form of balance sheets and profit and loss statements prepared by their accountants. The bankrupts offered both documentary and testimonial evidence and the bankruptcy referee looked at their records to clarify the evidence they gave and to make it more meaningful. At no point did the court hold that the records had to be in court.

*Miller v. Great American Ins. Co.,* 61 S.W.2d 205 (Mo.App.1933), is on all fours with the proposition that respondents did not have to produce their records. The court stated at page 207:

> [The] plaintiff was not attempting to prove the contents of his books, records, invoices by oral evidence; rather he was attempting to prove the value of his stock of goods at the time of the fire. To the extent that his books, records and invoices might have disclosed such value, he would have had two means of proof, one by his documentary evidence, and the other by his parol evidence. However, the fact that his documentary evidence would have been competent, if offered, did not thereby render his parol evidence of the same fact incompetent; and therefore, the objection that the testimony of the witness was not the best evidence of the fact to be proved is not well taken.

Additionally, the fact that a study by a witness of certain records of the company also gave him part or all of that same information does not prevent his testimony when based on his personal knowledge. *Central & Southern Truck Lines v. Westfall GMC Truck, Inc.,* 317 S.W.2d 841 (Mo. App.1958). In that case, the plaintiff claimed damage to its truck trailer due to defendant's negligence. One of the plaintiff's employees had studied certain records of the plaintiff with respect to the earning record of the trailer that was damaged. The defendant objected to the question as to what the earnings records of the trailer were, which objection was overruled, and the witness testified about $350.00 per month which represented its gross earnings in approximately the year preceding it having been wrecked, "less 6% for administrative, is what we figure our trailer earns us." The objection was based on the best evidence rule. The court stated, however, that the answer of the witness revealed that he was basing his statement as to the monthly net earnings of the truck on his personal knowledge of the subject and that this was true even though he constantly reviewed company records because of his position with the company and obtained information therefrom. At no time did the witness attempt to undertake to state the contents of any book or record or any part thereof. The court then cited 32 C.J.S., Evidence, Section 792d, page 721:

> The rule does not apply to exclude parol evidence given by witnesses whose testimony is founded on their personal knowledge independent of the books.

 Such are the facts of our case. Respondents never undertook to state the contents of any particular record or book regarding lost profits. They merely testified that they had computed their net profit

per bird on several occasions in the past and knew what the net profit amounted to. The evidence was sufficient to provide a rational basis for estimating the amount of lost profits.

On the issue of punitive damages, the assessment of damages is primarily the function of the jury. *McGowan v. Hoffman*, 609 S.W.2d 160 (Mo.App.1980). The court is authorized to order a remitter only when the verdict is so grossly excessive that it shocks the conscience of the court and convinces the court that both the jury and the trial court abused their discretion. We will exercise our power to interfere with the judgment of the jury and the trial court with caution and only where the verdict is manifestly unjust. *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938 (Mo.App.1978).

We have reviewed the evidence in light of the foregoing considerations and have concluded that the jury's award as pertaining to Joe Jurgensmeyer was not so excessive as to require a remitter. As stated earlier, the evidence does not support a finding of actual damages sustained by Joe Huhmann. The award for punitive damages is affirmed.

Judgment affirmed in full as pertaining to Joe Jurgensmeyer and affirmed as pertaining to punitive damages awarded to Joe Huhmann. Actual damages awarded to Joe Huhmann are reversed and vacated and nominal damages of $1 are awarded.

WILLIAM E. TURNAGE and MELVYN W. WIESMAN, Special Judges, concur.