**MILTON CONSTRUCTION & SUPPLY COMPANY, a Corporation, Plaintiff-Respondent,**

v.

**METROPOLITAN ST. LOUIS SEWER DISTRICT, a Municipal Corporation, Defendant-Appellant,**

and

**William L. Whalen et al., Intervenors-Appellants.**

No. 48569.

Supreme Court of Missouri,

Division No. 1.

Dec. 11, 1961.

Motion for Rehearing or to Transfer to Court en Banc Denied Jan. 8, 1962.

Charles B. Kaiser, Jr., George C. Hays,. Edward G. Wiegers and Charles Clardy,. St. Louis, for defendant-appellant.

Val Terschluse, St. Louis, Strubinger, Tudor, Tombrink & Wion, for intervenors-appellants.

Kerth, Thies & Schreiber, A. H. Kerth, Dalton W. Schreiber, Clayton, for plaintiff-respondent.

HOUSER, Commissioner.

Milton Construction & Supply Company, a corporation engaged in subdividing and developing real estate, building and selling houses to the public, filed a petition in the Circuit Court of St. Louis County seeking (1) a declaratory judgment that paragraph 7 C of its contract with Metropolitan Sewer District (hereinafter MSD) was void and unenforceable, and (2) recovery of $59,400 deposited by plaintiff with MSD pursuant to the contract, plus interest. Paragraph 7 C, briefly, provided that upon the occurrence of a certain contingency the amount deposited by plaintiff with MSD (to insure proper sanitary sewage disposal for two certain subdivisions) be refunded to the lot owners. One hundred lot owners were permitted to intervene and make claim to the fund for themselves and for the entire class of 297 lot owners of which they were a part. Tried to the Circuit Court of St. Louis County upon an agreed statement of facts and certain oral evidence presented to the court, sitting without a jury, judgment was rendered finding paragraph 7 C void and unenforceable; ordering the refund of the amount deposited, with interest, to plaintiff, and awarding judgment for plaintiff and against MSD in the sum of $59,400, plus $14,374.80 interest, in the total sum of $73,774.80. From that judgment MSD and intervenors appealed to this Court.

The agreed statement of facts, signed by the attorneys for plaintiff, MSD and intervenors, follows:

"Comes now the Plaintiff, Defendant and the Intervenors individually and as representatives of the entire class, by their respective attorneys, and agree that this Cause of Action may be submitted on the following agreed statement of facts:

"1. That Plaintiff is a corporation duly organized and existing under the laws of the State of Missouri, having its principal office at 7567 St. Charles Rock Road in Saint Louis County, Missouri.

"2. That The Metropolitan St. Louis Sewer District is a Municipal corporation, and a political subdivision of the State of Missouri, with power to sue and be sued, contract and be contracted with and in other ways to act as a public corporation as provided in a Plan submitted to the qualified voters of the City and County of St. Louis, Missouri, and adopted at special elections which were held separately in said City and said County on Tuesday, February 9, 1954.

"3. That the Intervenors herein, as individuals and as representatives of a class of persons similarly situated were customers of the Plaintiff, having purchased the hereinafter mentioned lots from Plaintiff prior to February 7, 1956.

"4. That under the provisions of Article 3, Section 3.010, effective on July 1, 1954, and by virtue of the adoption of the Plan by the vote of the people of the City and County of St. Louis, the existing sanitary and storm sewer systems and facilities of any and all municipalities, sewer districts and other public agencies situated within the boundaries of the said City and County, became subject to the exclusive jurisdiction, control and supervision of the Defendant; and under the provisions of Section 3.020 the District (Defendant) was empowered to have exclusive jurisdiction, control, possession and supervision of such sewers and drainage systems and facilities as are placed under its jurisdiction by the provisions of said Plan; that under the provisions of Section 12.010 the Plan was declared to be a Public Act, and all Courts shall take judicial notice thereof.

"5. That for a long time prior to the 9th day of February, 1954, the Plaintiff had been engaged in the business of acquiring,

developing and selling parcels of real estate situated within the County and City of St. Louis, Missouri.

"6. That Plaintiff was the developer of Subdivisions known as Hathaway Meadows No. 3 and Hathaway Meadows No. 4.

"7. That the Intervenors, as individuals and as representatives of the whole class, were the owners of 297 lots in said Subdivisions, Hathaway Meadows No. 3 and Hathaway Meadows No. 4, on February 7, 1956, being Lots 278 to and including 432 in Hathaway Meadows #3, and 433 to and including 587 in Hathaway Meadows #4, excepting therefrom Lots 541, and 542 to 553 in Hathaway Meadows #4, the latter being owned on said date (February 7, 1956) by the Plaintiff herein.

"8. That said Intervenors and the entire class as individuals had purchased said Lots from Plaintiff at various times prior to February 7, 1956 (or were owners in fee of some of said lots on said date by mesne conveyances from those who had purchased from Plaintiff) and were owners of record on February 7, 1956.

"9. That prior to construction and sale of said homes and lots, Plaintiff as developer of said Subdivisions and in accordance with its established plan for the development of said Subdivisions, desired to provide sanitary sewers and sewer facilities for said lots and to accomplish that end Plaintiff applied to Defendant for permission to install such sewage facilities in Hathaway Meadows No. 3 and Hathaway Meadows No. 4.

"10. That as a condition to the granting of a permit to Plaintiff for the installation of said sewers aforesaid, Defendant required Plaintiff to enter into an agreement bearing date of January 12, 1955, providing for sewage disposal, or construction of a complete permanent treatment plant, which said agreement is attached hereto and incorporated herein by reference the same as though fully set forth herein, and said agreement required the Plaintiff to deposit the sum of $200.00 per each lot for which a sanitary sewer connection had been requested to provide a fund for the construction of complete permanent treatment facilities or of a trunk sanitary sewer or sewers to care for sewage created by these and other homes.

"11. That Plaintiff was agreeable and willing to and did enter into said agreement as attached, on January 12, 1955, but, that Plaintiff objected to said agreement in part, especially sub-paragraph C of Paragraph 7, pertaining to refunding of the $200.00 per lot to the owners on the date when the bond issue was approved by voters of the sub-district, and therefore insisted upon the insertion of Paragraph 10 of said contract to preserve its right to test the validity of said contract and so that its signing of same would not constitute a waiver of that right.

"12. That Plaintiff did deposit the sum of $200.00 per lot, aggregating $61,600.00, with the defendant for the said 308 lots in issue, following the execution of said agreement.

"13. That said Agreement provided in part (Paragraph 7, subparagraph C) that if the voters of the sub-district in which these lots were located should vote for the construction of a trunk sanitary sewer to be financed by any form of obligation of the Sub-district, the amounts so deposited by plaintiff for the benefit of each lot would be refunded to the persons owning such lots on the date that the indebtedness is authorized by such vote.

"14. That thereafter Plaintiff constructed and built the various houses on said lots and installed the house laterals and street laterals within the area mentioned and thereafter sold said houses and lots to the Intervenors herein, or to the predecessors in title to some of the Intervenors herein.

"15. That on February 7, 1956, the lawful voters of the Sub-district of Defendant wherein these lots are located, at an election held for that purpose, authorized the issuance of bonds as an indebtedness of said

Sub-district, as provided by law, the proceeds of which would be used for the construction of a trunk sanitary sewer, and said bonds were to be retired by taxation of the people of said Sub-district, and since said time, annual taxes are and have been collected for said purpose. That the records of St. Louis County, Missouri, will show the following total assessments, for the years stated, of the properties within the boundaries of the Maline Creek Sanitary Trunk Sewer Sub-district, to-wit:

| | |
|---|---|
| December 31, 1955 | $56,729,240.00 |
| December 31, 1956 | 89,875,000.00 |
| December 31, 1957 | 93,404,683.00 |

"16. That Defendant then notified all concerned that the aforementioned monies held on deposit by it would be refunded to the owners of the lots on the date in question (February 7, 1956) and Defendant did refund to Plaintiff the sum of $2,200 for 11 of said lots which were still owned by Plaintiff on said date, being Lots 541, and 542 to 553.

"17. That all other aforementioned lots, 278 to 432 of Hathaway Meadows No. 3, and 433 to 587 (excepting the lots mentioned in paragraph 16 above) had been sold by Plaintiff prior to February 7, 1956, to the Intervenors herein or others, but being the whole class represented as Intervenors or by said Intervenors as a class.

"18. That Plaintiff served notice on Defendant that it would contest the validity of the agreement attached and said remaining funds were held in abeyance by Defendant and not refunded under said agreement pending outcome of such contest.

"19. That thereafter this action was instituted by Plaintiff to test the validity of said contract and Intervenors filed their separate petition claiming said funds for themselves individually and as representatives of the entire class, under the contract.

"20. That all parties hereto had knowledge of said deposits and the terms of the referenced agreement prior to sale of said lots and homes by Plaintiff herein.

"21. That a Copy of the Plan of the Metropolitan St. Louis Sewer District as adopted by the voters of the City and County of St. Louis, is filed herewith and made a part of this agreement as though fully set forth herein.

"22. That parties admit the demand for payment made by Plaintiff and Intervenors for the aforementioned funds held on deposit by Defendant, as alleged in their respective amended petitions.

"23. That the balance in dispute in this particular cause of action is the sum of $200 per lot for a total of 297 lots, equal to $59,400.00, and that $2,200.00 has been refunded to Plaintiff as owner of the 11 said lots on the date mentioned in the agreement (February 7, 1956).

"24. That the parties hereto reserve the right to offer additional evidence at the time of submission of this cause."

The agreement between MSD and plaintiff referred to in the agreed statement of facts required plaintiff to prepare plans and specifications for sanitary sewers to be installed in its subdivisions, with provision for their extension and connection to discharge into an existing sanitary sewer system served by an existing treatment plant, or a new sewage treatment plant. Upon approval of the plans and specifications plaintiff was obligated to "make all payments or deposits of fees or guarantee funds for the proposed construction before such construction will be allowed to start," and to construct and install such sewers or treatment plant at its own expense and under the supervision of MSD. Upon completion of the sewers plaintiff was to appoint three interim trustees to operate, maintain and repair the sewers and treatment plant until the sewers and treatment plant should be transferred to MSD by deed of dedication transferring to MSD all right, title and interest in the sewers and treatment plant, whereupon the trusteeship would cease. Paragraph 7 pro-

vided that "Before any construction is started on any lot within the parcel or subdivision, the Contractor shall deposit with the District the sum of Two Hundred and No/100 Dollars ($200.00), to be held by the District for each lot for which a sanitary sewer connection has been requested. The District shall deposit and hold such sums, together with such other sums similarly deposited, in a separate account in a bank or trust company, and shall disburse therefrom, in accordance with the agreement between the District and the Trustees on one of" several conditions: (A) If the District constructed a trunk sewer for an amount equal to or less than the total amount of the deposits, the deposits were to be disbursed in payment of the subdivision's proportion of the costs, and any balance remaining was to be refunded ratably to the owners of the lots on the date the trunk sewer was completed and accepted. (B) If the deposits were not sufficient to pay for a trunk sewer the District could elect to build a trunk sewer to be paid for by special assessment, crediting each lot with the $200 deposit, and the lot owner and the property was to be liable for the amount in excess of the deposit. (C) provided: "If the District finds that it is impracticable to finance the construction of a trunk sanitary sewer or sewers in the manner set out in either A or B, above, and the subdistrict in which the said subdivision is located shall vote for the construction of a trunk sanitary sewer to be financed by any form of obligation of the subdistrict, the amounts held on deposit for the benefit of each lot shall be refunded to the persons owning such lots on the date that the indebtedness is authorized by such vote." (This is the contingency which actually occurred.) (D) If it should be determined that the construction of a trunk sewer was impracticable, the District could build a sewage treatment plant to serve plaintiffs' and other subdivisions. The deposits would apply thereon, and any balance remaining was to be refunded ratably to the persons owning the lots on the date the treatment plant and connecting sewers were completed and accepted. (E) If the distance between the subdivisions and existing or proposed trunk sewers was considerable, and there was no reasonable prospect of connecting sub-trunk sewers, and the creek serving the subdivisions was not considered polluted, the sanitary sewers of the subdivisions were to drain into a complete sewage treatment plant, and in addition, the contractor was to deposit $200 per lot, to be disbursed as prescribed in paragraphs 7 A and B.

MSD's first point is that the trial court erred in overruling MSD's motion to dismiss for lack of jurisdiction over the subject matter. MSD was established under Constitution, Art. VI, § 30(a), V.A.M.S., for the functional administration of services common to certain areas of the City and County of St. Louis. The adopted Plan for the execution of the powers given MSD contained a review procedure, which MSD contends is exclusive by reason of the provision of § 30(b) of Art. VI of the Constitution that the Plan adopted "shall become the organic law of the territory therein defined, and shall take the place of and supersede all laws, charter provisions and ordinances inconsistent therewith relating to said territory." Section 12.110 of the Plan provides that "Any person * * * aggrieved by any decision or order of the Board or of any officer of the District may present to the Circuit Court * * * a petition, duly verified, setting forth that such decision or order is illegal, in whole or in part, and specifying the grounds of the illegality. Such petition shall be presented to the court within thirty days after the filing of the decision or order in the office of the Board or officer * * *. Upon the presentation of such petition, the court may allow a writ of certiorari directed to the Board or officer * * * to review such decision or order of the Board or officer * * *, and shall prescribe the time within which a return thereto may be made and served upon the aggrieved person * * *, etc." MSD contends that plaintiff was aggrieved by an "order or decision" of the

Board[1]; that the circuit court had jurisdiction to adjudicate plaintiff's cause of action only as provided in Plan § 12.110; that under Plan § 12.110 the time limit for the exercise of jurisdiction was "thirty days after the date Plaintiff was 'aggrieved'"; that plaintiff was aggrieved January 17, 1956, the date plaintiff deposited the money with defendant under protest, so that plaintiff's right to file a petition for a writ of certiorari under Plan § 12.110 expired February 17, 1956; that plaintiff's petition was not filed until September 12, 1956, almost eight months too late under Plan § 12.110, and also too late under the doctrine of laches.

■ The circuit court properly overruled MSD's motion to dismiss. The review procedure prescribed by Plan § 12.110 relates to complaints of illegality of *decisions* and *orders* of the Board or officers of the District. Plaintiff's petition did not attack the legality of any decision or order of the Board or of any officer of the District, nor did it in its petition claim to have been "aggrieved" by any such decision or order. Plaintiff, expressly alleging that paragraph 7 C of its agreement with MSD was void and unenforceable, filed a petition for a declaratory judgment and for the recovery of a sum deposited under protest under the agreement. The theory of plaintiff's petition was that due to the invalidity of paragraph 7 C of the agreement plaintiff was entitled to recover a certain sum of money. Plaintiff sought a judicial declaration of its rights—a determination of the validity of a paragraph of an agreement in which it was interested—a situation precisely contemplated by § 527.020, RSMo 1949, V.A.M.S., of the Declaratory Judgments Act. The circuit court had jurisdiction to entertain this action for a declaratory judgment and for the recovery of the sum deposited under protest.

The question for decision on the merits is whether paragraph 7 C is a valid contractual provision in the exercise of the police power granted MSD to protect the public health and welfare, or is void and unenforceable, arbitrary, discriminatory, ultra vires, unjust and inequitable, against public policy and whether the enforcement of paragraph 7 C results in the unlawful taking of plaintiff's property without due process of law and without just compensation. There is no issue as to the power of MSD to require a subdivider-contractor to make a deposit such as this one. This is conceded by plaintiff, which in its brief says it "does not question the right of the Defendant Sewer District to require assurance by way of a deposit to guarantee that appropriate sewer facilities will be provided as the public health may require." Plaintiff raises no objection to the use of the funds deposited in any of the several ways provided for in paragraph 7, subparagraphs A, B, D or E. Nor does plaintiff contend that the sum required to be deposited ($200 per lot) is excessive in amount. The gist and burden of plaintiff's complaint is that paragraph 7 C required the refund of the deposits *to the owners of the lots* rather than to plaintiff; that the money on deposit is plaintiff's property and should be refunded to it, and not "to a third party, who may happen to own the lot." Plaintiff is concerned only with the provision for refund to the lot owners upon the occurrence of the contingency mentioned in subparagraph C of paragraph 7. Specifically, plaintiff urges that a contractual provision for refund of deposits to the various persons owning lots on the date of approval of the bond issue constitutes a wrongful and unlawful appropriation and taking of the property of plaintiff without due process and without just compensation, in contravention of federal and state constitutional guaranties; that one has an in-

1. Namely, resolutions passed by the Board prescribing the procedure for applicants for approval of subdivision sanitary sewers where trunk sewers are not presently available. These resolutions prescribe the form of the contractual provisions to be used where it appears that applicant does not have available funds to construct an adequate trunk sewer (the same form used in paragraph 7 C of the instant contract).

herent right to acquire, enjoy and dispose of his property, which shall not be taken away from him without his consent, without due process of law, and that there is no justification "for taking the property of plaintiff and giving it to the property owners"; and that this refund provision is arbitrary, unreasonable, oppressive and confiscatory.

A regulation designed to promote the health and welfare of the people does not infringe on constitutional guaranties of personal rights and due process "unless the regulation passes the bounds of reason and assumes the character of arbitrary power." Brawner v. Brawner, Mo.Sup., 327 S.W.2d 808, 815; 16A C.J.S. Constitutional Law § 606. The object sought to be attained by the contractual provision challenged was the refund of the deposit to the proper party upon the issuance of subdistrict obligation bonds to pay for the improvement. We cannot say that the provision that, in the contingency which happened, the amounts held on deposit be refunded to the persons owning the lots on the date the debt was voted, is unreasonable and arbitrary, or that it constitutes the taking of plaintiff's property and the giving of it to plaintiff's grantees in violation of constitutional rights of property. On the contrary, this provision bears a reasonable and rational connection with the object sought to be attained, and does not deprive plaintiff of its property against its will. Tying the right to refund to the ownership of the lots was a reasonable exercise of the power of MSD to require a deposit. By voting bonds to pay for the improvement the funds deposited were no longer needed, and the obligation was thereby imposed upon the landowners in the subdistrict to pay for the improvement by taxation. In that contingency it was reasonable to require that the deposit, made for the benefit and to the account of each lot, be refunded to the owners of the lots, upon whom the tax burden would fall. Paragraph 7 C does not forcibly deprive plaintiff of its property against its will because plaintiff was entitled to the return of the deposit made on account of a particular lot if plaintiff owned the lot on the date the bond issue passed. Plaintiff was not required, in a legal sense, to give up its interest in the deposit. Plaintiff could keep its lots until the issue was settled, and recoup the deposit if there was a favorable vote at an election. As a matter of fact plaintiff received a refund of $2,200, representing the deposits made on eleven lots still owned by plaintiff on the date of the bond election. In selling lots before the issue was settled plaintiff, knowing of the provisions of paragraph 7 C in its contract with MSD, must be held to have voluntarily forfeited the possibility of securing a refund of the amount of the deposits on the lots thus sold. To sell now and forfeit its deposit, or to wait and stand a chance of getting it back, were not the only choices open to plaintiff. There was a third possibility: plaintiff had the opportunity to treat the deposit of $200 per lot as an item of cost and add it to the purchase price of the homes it was preparing to market. "All parties * * * had knowledge of said deposits and the terms of the referenced agreement prior to sale of said lots and homes by Plaintiff." (Paragraph 20, agreed statement of facts.) In fact, plaintiff knew this a considerable length of time before the lots were sold. Plaintiff contracted "to make all deposits of guarantee funds" before construction should start, and paragraph 14 of the agreed statement of facts plainly recites that it was *after* entering into the contract with MSD that plaintiff installed the house and street laterals, constructed the houses and "sold said houses and lots to the Intervenors herein, * *." Plaintiff's assertion to the contrary will not be considered. At the hearing plaintiff's officers were permitted to testify that "a lot of houses"—"a greater portion" of them—were sold before they knew they would be required to deposit $200 per lot. This evidence was inadmissible. It should not have been considered by the trial court and is not considered on appeal, for the reason that it directly contradicts paragraphs

14 and 20 of the agreed statement of facts. The parties voluntarily entered into an agreement as to the facts to be used as evidence. Counsel for all parties signed the stipulation. It was filed in court. The facts contained in the agreed statement are the facts which the parties did not wish to controvert. The parties are bound and concluded by their agreement as to these facts, including paragraph 20, Hansen v. Ryan, Mo.Sup., 186 S.W.2d 595; Munford v. Wilson, 15 Mo. 540, 558, and will not be heard to dispute what they have agreed upon. "A party having admitted a fact should not be permitted to introduce evidence to contradict the existence of such fact." 88 C.J.S. Trial § 59, p. 166.

◼ Plaintiff objects that the action taken by MSD is ultra vires and beyond the scope and authority for which the District was created and exists; that MSD did not have power, expressly or impliedly, to give plaintiff's monies "to others who might well be strangers to it in its sales and transactions"; that paragraph 7 C is palpably not for the benefit of MSD and did not further its purposes, namely, to supply functional administration of services to the area, and in the interest of public health and to provide adequate sewer and drainage facilities. In the exercise of the conceded power of MSD to enter into contracts requiring subdividers to make deposits to insure the installation of appropriate sewer facilities for the protection of the public health, MSD had the power to make reasonable provisions with respect to the refund of unused amounts so deposited, and to require that the refund be made as provided in paragraph 7 C, under the circumstances of this case.

Plaintiff further contends the agreement constitutes a wrongful and unlawful discrimination against plaintiff and others for the reason that the payment of $200 will unjustly enrich various lot owners in an amount in excess of taxes they will be required to pay for this improvement. Plaintiff introduced evidence that the average as-

sessed valuation of 100 homes in the subdivisions was $4,891 and that the last tax rate for sewer purposes in the District was 12¢ per $100 valuation. Plaintiff argues that over a 20-year period at this rate and on this assessment the average lot owner would pay only $117.40 in taxes, and not $200, which would give the lot owner an advantage of $82.60. How much taxes any lot owner will pay over a 20-year period in the future is wholly speculative, but assuming the correctness of the figures, discrimination againt plaintiff is not thereby demonstrated. There is nothing to show that the taxes of plaintiff or other taxpayers will be increased, or that the taxes of intervenors will be decreased by the enforcement of paragraph 7 C. But plaintiff is in no position to complain that the lot owners will have a fund out of which they can pay taxes, or that intervenors will be unjustly enriched, because plaintiff had no further right to or interest in the deposits after it sold the lots. Certainly there was no unjust enrichment if plaintiff tacked $200 onto the price plaintiff otherwise would have charged for these houses.

◼ Finally, plaintiff contends that paragraph 7 C is against public policy and in violation of the Corrupt Practices Act (Chapter 129, RSMo 1959, V.A.M.S.) in that it tends to impair the integrity of public elections and to curtail the free exercise of the elective franchise. There was evidence that at a public meeting attended by lot owners in the subdivisions the District Director of MSD stated that if the people voted the bond issue they would get back the $200. Paragraph 7 C does not require the doing of any act which might interfere with the orderly conduct of an election in a free, open and uninfluenced manner, or with the free and untrammeled exercise of the right of franchise by any voter. The fact that private contractual rights may turn upon the outcome of an election, or that someone makes an appeal to the voters based upon the provisions of a contract, does not vitiate the contract. The question is whether the terms of the contract itself

tend to so impair and curtail. See 17 C.J.S. Contracts § 218. Paragraph 7 C is innocent of any such tendency.

The judgment of the circuit court is reversed and the cause is remanded with directions to set aside the judgment dated September 26, 1960, and to enter a new judgment for intervenors and against defendant for $59,400 on their intervening petition, said judgment to be entered as of September 26, 1960, and for defendant and against plaintiff on the issues as between plaintiff and defendant.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.