Henry G. SIEMER et al., Plaintiffs-Respondents,

v.

SCHUERMANN BUILDING & REALTY CO. et al., Defendants-Appellants.

Henry G. SIEMER et al., Plaintiffs-Appellants,

v.

The METROPOLITAN ST. LOUIS SEWER DISTRICT, Defendant-Respondent,

Schuermann Building & Realty Co. et al., Defendants.

Nos. 49962, 50023.

Supreme Court of Missouri,
Division No. 1.

July 13, 1964.

Motions for Rehearing or to Transfer to Court En Banc Denied Sept. 14, 1964.

Harry J. Stadin, J. Raymond Dyer, St. Louis, for respondents.

Charles B. Kaiser, Charles Clardy, John J. Shanahan, St. Louis, for defendant, Metropolitan St. Louis Sewer District.

Bertram W. Tremayne, Jr., A. Wimmer Carr, Tremayne, Joaquin, Lay, Batts & Carr, Clayton, for Schuermann Bldg. & Realty Co., defendants-appellants.

WELBORN, Commissioner.

This is a class action by 12 named plaintiffs on behalf of themselves and other persons similarly situated, all purchasers of houses and lots in a subdivision in St. Louis County, to recover on behalf of each plaintiff and member of the class the sum of $200 which the defendant subdivision developers had deposited with the defendant Metropolitan St. Louis Sewer District under an agreement which provided that, in the event of approval of a bond issue for a trunk sewer, the deposit would be returned to the "persons owning such lots" on the date of the election. The bond issue was approved at an election held on February 7, 1956. The plaintiffs had, prior to that time, entered into purchase contracts for lots, but deeds were not executed for them until after the election. Metropolitan Sewer Dis-

trict returned the deposits to record owners. The deposits here in question were returned to the owner-developers as the record owners on February 7, 1956. The trial court found for the plaintiffs and entered judgment against the owner-developers for an aggregate of $19,400. The court dismissed the petition as to Metropolitan Sewer District at the close of all the evidence. The owner-developers appealed from the judgment in favor of the plaintiffs and the plaintiffs appealed from the judgment dismissing their petition against Metropolitan Sewer District.

The owner-developers in this case are corporations affiliated with the Schuermann Building & Realty Company. The original agreement between Metropolitan Sewer District (herein referred to as MSD) and Land Investment Corporation was dated February 15, 1955 and covered Blocks 1 to 12 in a subdivision known as Northland Hills. Subsequent agreements were entered into between MSD and Land Investment Corporation covering specific lots in Blocks 1–12, inclusive. Each of the agreements was in a form prescribed by MSD. The form of the agreement was the same as that recently considered by this court in Milton Construction & Supply Company v. Metropolitan St. Louis Sewer District, Mo.Sup., 352 S.W.2d 685. The purpose of the agreement was to provide financing of construction of either trunk sewers or sewage disposal facilities for the subdivision which the owner proposed to develop. Each of the agreements required the owner-developer to construct sanitary sewers within the subdivision which were to be, and eventually were in this case, transferred to MSD.

Paragraph 7 of the agreement provided: "Before any construction is started on any lot within the parcel or subdivision, the Contractor shall deposit with the District the sum of Two-Hundred dollars ($200.00), to be held by the District for each lot for which a sanitary sewer connection has been requested. The District shall deposit and hold such sums, together with such other sums similarly deposited, in a separate account in a bank or trust company, and shall disburse therefrom, on one of the following conditions: * * *." Five conditions are thereafter specified. A. If a trunk sewer is constructed at a cost not in excess of the total amount of the deposits, such deposits are to be used in paying the subdivision's costs of planning and constructing the trunk sewer and any balance remaining after such full payment is to be refunded ratably to the persons owning the lots on the acceptance date of the completion of the trunk sewer. B. If the deposit is not sufficient to cover the cost of the trunk sewer and the difference is not enough to warrant issuance of bonds, the District may build the trunk sewer and pay for it by special benefit assessments. Special benefit assessment bills issued against each lot are to be credited with the amount deposited for the lot and the lot owner shall be liable for the amount in excess of the deposit for the lot. Condition C, which is the condition here involved, is as follows: "If the District finds that it is impracticable to finance the construction of a trunk sanitary sewer or sewers in the manner set out in either A or B, above, and the subdistrict in which the said subdivision is located shall vote for the construction of a trunk sanitary sewer to be financed by any form of obligation of the subdistrict, the amounts held on deposit for the benefit of each lot shall be refunded to the persons owning such lots on the date that the indebtedness is authorized by such vote." Conditions D and E are not involved in this case and shed no light on the construction of the applicable portion of the agreement.

Pursuant to the requirement of the agreement, either Land Investment Corporation or other Schuermann affiliated corporations to which the lots were subsequently transferred made deposits of $200 each for a total of 284 lots in Northland Hills. Sales of lots within the subdivision began shortly after the February, 1955 agreement between MSD and Land Investment Corporation. The Schuermann Building & Realty Company acted as general contractor

and sales agent for the affiliated corporations in the construction and sale of residences in the subdivision. The system of selling involved first a choice by the purchaser of the lot which he elected to buy and the selection of the type of house which was to be constructed upon it. At that time a deposit was made with the sales agent, Schuermann Building & Realty Company and a receipt issued therefor which by its terms granted the purchaser a 3-day option on the purchase of a designated lot and the residence to be constructed thereon for a specified sale price. Thereafter, the purchaser went to the office of Schuermann Building & Realty Company for execution of an "Earnest Money Receipt and Sale Contract" between the purchaser and the owner corporation, through Schuermann Building & Realty Company. This document acknowledged receipt of the earnest money deposited and described the property involved and thereafter recited "which property is this day sold" to the purchaser. The contract provided for the payment of the balance of the purchase price and for closing of the transaction "on completion of property." If not closed because of default of purchaser, $200 of the earnest money was to be forfeited to the seller and the contract became void. Construction of the house began after the contract had been signed and upon its completion, the transaction was closed and a deed delivered to the purchaser.

On February 7, 1956, an election was held at which voters in the Maline Creek Sewer Subdistrict approved a bond issue for the trunk sewers contemplated by the agreement between MSD and Land Investment Corporation. Prior to the election, sales of lots in Northland Hills had been made in accordance with the above described method. Before February 7, 1956, 89 houses and lots had been transferred by warranty deed to the purchasers. On February 13, 1956, trustees of MSD met and discussed the Maline Creek election. The Chairman of the Board of Trustees, Mr. John Bogdanor, who was also general manager of what was described

as the "Schuermann complex," presided at the February 13th meeting of the Board of Trustees. At that meeting, the trustees decided that no further escrow fees should be collected for lots within the Maline Creek watershed. They further ordered that all escrow fees previously collected be refunded in accordance with the respective escrow agreements. The number of such agreements does not appear. Apparently there were several such agreements in addition to that between MSD and Land Investment Corporation. The minutes of the meeting show that there was a discussion of the method for obtaining the names of owners of lots in the subdivisions who would be entitled to refund of deposits. The minutes recite: "Suggestion was made that we contact subdividers for the names and address of owners in their subdivision as of midnight, February 7, 1956, so that we can then have the Title Companies confirm the owners of such properties on that date."

· On February 23, 1956, Mr. John P. McCammon, general counsel for MSD, directed a letter to Land Investment Corporation in which he stated: "Under our agreements with you we are required to make refunds to the persons who were the record owners on February 7, 1956 of each of the parcels of land listed above. It will greatly facilitate our work if you will be kind enough to furnish us the names of your immediate grantees, and the dates on which you conveyed, after which we will be able to have the titles run."

Lists were prepared by Schuermann and the affiliated owner corporations showing the names of persons to whom lots within the subdivision had been transferred prior to February 7, 1956, as shown by the Schuermann records. No reference was made to the fact that contracts of sale had been entered into as of that date for the sale of lots on which the deeds had not been delivered. For each of the 89 lots which had been transferred by warranty deed prior to February 7, a $200 refund was made to the record owner. For each of the remaining 195 lots, a $200 refund was made to Schuer-

mann or the affiliated owner corporations. Included among these 195 were 97 lots which were under sales contract, but which were not transferred to the purchaser until sometime after February 7, 1956. No contracts had been made on February 7 for the remaining 98 lots. In their petition, plaintiffs sought originally to obtain the deposits on behalf of the purchasers of the 98 lots not under contract as of February 7. However, that claim was abandoned and no question is here raised as to Schuermann's right to the refund of the deposits as to such 98 lots.

The trial court found that the plaintiffs and the class whom they represented were beneficiaries of a contingent third party contract between MSD and Land Investment Corporation and that, as purchase contract holders, they should be considered "persons owning" the lots on the date of the election and that they were entitled to the refunds under the agreement.

In reaching this conclusion, the court relied particularly upon what it described as a "pattern of salesmanship," found to have been followed by Schuermann's office staff and salesmen. Such pattern was based upon the testimony of a number of lot purchasers that, either at the time they selected their lots at the subdivision or at the time of the sales contract, Schuermann's salesmen or office personnel told them that $200 of the earnest money deposited by the purchaser for each lot would be placed in escrow for construction of the Maline Creek sewer and that, if the bond issue passed, the $200 would be returned to the purchaser. The salesmen and office personnel charged with making such statements denied having made them. Bogdanor testified that salesmen on the project were instructed to make no reference to a sewer deposit. No reference to it is found in any of the sales documents introduced into evidence. However, the court found that such representations had been made and that the "pattern of salesmanship was indicative of the construction that should be placed on the re-

fund provisions of the February 15, 1955 contract."

The court further found that MSD "was clearly not liable to plaintiffs. Rather, it had been imposed upon by Schuermann." The court concluded that by turning the deposits paid by MSD over to "its lot selling subsidiaries (Schuermann Building & Realty Company) had breached the third party beneficiary contract its subsidiary Land Investment Corp. had entered into with Metropolitan, by which Schuermann was bound. * * * All of its lot selling subsidiaries named as parties defendant who received the refunds became liable for money had (and) received in violation of the third party beneficiary contract of February 15, 1955, by which contract they were bound." A joint and several judgment was entered against Schuermann Building & Realty Company for $19,400 and against the several selling corporations for the amount of the refund each received.

On this appeal, the appellant Schuermann corporations make numerous allegations of error. However, their primary contention is that the trial court erroneously construed the February 15, 1955 agreement between MSD and Land Development Corporation to mean that purchase contract holders on the date of the election were "persons owning * * * lots" on that date. Schuermann's position is that only record owners were entitled to the benefit of the refund provisions of the agreement. They rely primarily upon the construction given the agreement by the parties to it. They point to the action of the Board of Trustees of MSD on February 13, 1956, as showing MSD's construction of the refund provision. Schuermann asserts that any other construction which would have required MSD to "sift out the various equitable interests would be perilous indeed and unreasonable."

MSD, as respondent in the appeal from the judgment dismissing plaintiffs' petition as to it, of course seeks to sustain the construction which it gave the agreement

in making the refunds thereunder. They state: "Certainly from the very outset, MSD, which had prepared the agreement, indicated that its construction of the phrase 'persons owning' was intended to apply to 'record' owners."

On this appeal, we take the issues as presented by the parties. No question has been raised as to the nature of the beneficial interest claimed by the plaintiffs, i. e., whether they are donee, creditor, or incidental beneficiaries.

"It is undoubtedly true that a contract may be made by two or more people so that a third party or third parties will be beneficiaries of the agreement. It is likewise true that one who claims to be such beneficiary must show either from the contract itself or from evidence, that he is the beneficiary, intended by the parties or is a member of a class of beneficiaries intended by the parties." Hoge v. Farmers Market and Supply Company of Las Cruces, 61 N.M. 138, 296 P.2d 476, 479.

The term "owner" or the equivalent phrase "person owning" does not have a fixed, definite meaning. In its restricted sense, it means "legal owner." In a broader sense, it means any person beneficially interested in property. Granite Bituminous Paving Co. v. Parkview Realty & Improvement Co., 168 Mo.App. 468, 151 S.W. 479. The restricted meaning has been given the term "owner" in construing various tax statutes employing the term. See Millerson v. T. W. Doherty Land & Cattle Co., Mo.Sup., 241 S.W. 907; City of St. Joseph ex rel. Swenson v. Forsee, 110 Mo.App. 127, 84 S.W. 98. On the other hand, equitable owners have been held to be within the term "owners" as used in the mechanics' lien statutes (see Hertel Electric Company, Inc. v. Gabriel, Mo.App., 292 S.W.2d 95, 98(4); Vasquez v. Village Center, Inc., Mo.Sup., 362 S.W.2d 588, 596(13)) and in contracts of insurance (see Avery v. Mechanics Ins. Co. of Philadelphia, Mo. App., 295 S.W. 509, 512(1)).

■ In view of the different meanings which could properly be attributed to the phrase "persons owning" and in the absence of any other provision of the contract itself which sheds light on the question, we must look for other evidence of the meaning of the phrase intended by the parties to the agreement. They had the right to determine between themselves to whom the refunds would be paid. If their determination can be established, it should be given effect, insofar as claims based upon the agreement are concerned.

In arriving at the parties' determination, all of the facts and circumstances surrounding its execution and the practical application of the agreement may be taken into consideration. However, the evidence in this case is quite limited insofar as the circumstances surrounding the agreement are concerned. We are told that the agreement was in a standard form prepared by MSD. Similar agreements were used with respect to other subdivisions. See Milton Construction & Supply Co. v. Metropolitan St. Louis Sewer District, Mo.Sup., 352 S. W.2d 685.

"A bilateral contract containing many mutual promises may contain one specific provision for the conveyance of property to a third person. The meaning and operation of that provision and the existence of an enforceable right in the third person as a donee beneficiary may depend upon the purpose for which the provision was included. If, as one of the parties knew when the contract was made, the other party alone caused the provision to be put in for a purpose of his own, the purpose and interpretation of that other party becomes the sole issue in determining the rights of the third person. It is then just as if the provision was in a unilateral contract of donation." 3 Corbin on Contracts, Sec. 537, p. 52.

Here the provision for return of the deposit to the persons owning the lot on

the date of the election was placed in the agreement by MSD. Although there is no evidence that Land Development Corporation objected to the provision, we note that, in the Milton case, supra, objection by the contractor to the provision was unavailing. MSD insisted upon it as a condition for its approval of sewer plans, necessary if the land in question was to be subdivided and lots sold. In such situation, we would accord considerable, if not controlling, effect to MSD's interpretation of the language which it insisted upon.

According to the only evidence of MSD's interpretation of the agreement, "persons owning" were record owners, only. Whether or not they so advised Schuermann prior to the election, they did so shortly thereafter and Schuermann did not suggest a different interpretation.

The plaintiffs question the effect of the MSD interpretation because of Bogdanor's position as Chairman of the Board of Trustees of MSD and as general manager of the "Schuermann complex." However, we find nothing in the record to support the assertion in plaintiffs' brief that it was Bogdanor "who caused MSD to interpret 'owners' as 'record owners.'" They assert that "there is plenty of evidence that Mr. Bogdanor did just that." However, the only evidence which they cite to support their assertion is the minutes of the meeting of February 13, 1956, of the Board of Trustees of MSD, and Bogdanor's statement, on cross-examination, that he was a member of the Board of Trustees and his affirmative reply to the question whether he was "an important official of the Schuermann complex." Bogdanor unquestionably presided at the meeting of February 13, 1956, at which action was instituted to refund the deposits. However, there is no showing that Bogdanor in any manner dictated the action taken by the board or even that he participated in the discussion of the subject. We find no evidence which supports the charges that Bogdanor dictated the construction which MSD followed and that he did so in the interest

of his private employer, Schuermann. The testimony was that the Schuermann subdivision and all others on which refunds were made were all treated in the same manner. In such circumstances, we would reject the contention that the interpretation placed on the agreement by MSD was not a good faith expression of that agency's idea of its meaning.

■ As above stated, the trial court, in its construction of the agreement, relied heavily on the "pattern of salesmanship" followed by Schuermann in the sale of the lots in Northland Hills. We find nothing in the record here to cause us to reject the trial court's finding of fact, based on directly conflicting oral testimony, that Schuermann's sales representatives and office personnel did tell purchasers that $200 of their earnest money deposit went for the sewer and would be refunded upon approval of the bond issue. However, there was no showing that this representation was based in any manner upon the terms of the agreement between MSD and Land Development Corporation. There was no showing that these representations were made with the knowledge of Schuermann officers familiar with the terms of the agreement. The only testimony on the subject was Bogdanor's testimony that salesmen were instructed to say nothing regarding the sewer deposits. In such circumstances, we would not find such statements, even if made, evidence of Schuermann's construction of the agreement, which, as promisee, under the contract, might be given controlling effect. 17A C.J.S. Contracts § 519(4), p. 977.

■ The trial court found that to permit Schuermann to retain the $19,400 in deposits involved in this case would result in their unjust enrichment. However, the court's judgment was not a decree in equity, but was a judgment at law, finding that Schuermann Building & Realty Company, although not a party to the agreement between MSD and Land Development Corporation, had breached the

agreement. Unjust enrichment is not a factor in such determination. Either the contract afforded the plaintiffs the right to the refund thereunder or it did not.

Further, there was no showing of any relationship between prices at which houses and lo.. were sold in Northland Hills and the sewer deposit and refund. According to Bogdanor, the original basic price for a 2-bedroom house was $15,100. In December, 1955, the basic price was increased by $250.00. This was prior to the bond issue election. In March, 1956, after the bond issue election, there was another $250 increase in the basic price. According to Bogdanor, there were no increases or decreases in prices as far as the individual purchasers were concerned because of the sewer deposits. From this, we conclude that there was no showing that, as the court found, the plaintiffs were discriminated against. True, had they received their deeds prior to February 7, 1956, they would have received the $200 refund which purchasers with deeds did receive. However, comparison of this situation of the plaintiffs with those who purchased after the election shows that the plaintiffs did not fare badly by comparison with such purchasers, particularly those who purchased after the March, 1956 price increase.

■ In our opinion, the trial court erroneously concluded that the contract between MSD and Land Development Corporation gave the plaintiffs a claim to the refund of the $200 deposit. In our opinion, the plaintiffs failed to show that they were "persons owning" the lots on the date of the election, within the meaning of the contract.

Such conclusion practically disposes of plaintiffs' appeal from the judgment in favor of MSD. However, there are two questions raised by plaintiffs which are not answered by this conclusion.

■ On their appeal plaintiffs contend that, regardless of the disposition of the Schuermann appeal, the trial court's finding that the contract phrase "persons owning such lots" included plaintiffs and the class whom they represent is, as to MSD,. the law of the case and that, MSD not having appealed, the finding is res adjudicata as to it. However, having been dismissed as a party defendant at the time of such judgment, MSD had no standing to appeal from the judgment in favor of the plaintiffs and against the Schuermann defendants. Section 512.020, RSMo 1959,. V.A.M.S.; Panich v. Curtis, Owen, Fuller Corporation, Mo.App., 124 S.W.2d 619. On plaintiffs' appeal from the judgment in: its favor, MSD could assert whatever basis it felt would, on the record presented, sustain the judgment in its behalf. See Russell v. Union Electric Co., 238 Mo.App:. 1074, 191 S.W.2d 278, 287(13–15).

■ On their appeal plaintiffs further contend that the trial court erred in entertaining Metropolitan's motion to dismiss.. Plaintiffs state that the trial court "should, as required by law, have disqualified itself from passing on that motion, being interested in the outcome of plaintiffs' cause against Metropolitan by reason of the fact that, as required by law, it had, by a majority of its judges, approved the appointment of three of Metropolitan's six ⁻rustees, including that of John M. Bogdanor, the Chairman of Metropolitan's Board of Trustees. Where, as here, a court is called upon to act judicially on a motion of a public corporation to dismiss plaintiffs' petition as to it, and that court's action on that motion involves passing on the conduct of three of that corporation's six Trustees, whose appointments to executive position in that public corporation that court has affirmatively approved, public policy, as well as the rules of this court and the statutory law of this state, requires that court to step aside and call in another judge, of a court that has not approved such appointments, to sit in the case, or to request this court to transfer a judge, of a court that has not approved such appointments, to try that motion."

This complaint is based upon the fact that MSD's charter provides for a governing board of six trustees, three residents of the City of St. Louis appointed by the mayor with the approval of the majority of the judges of the Circuit Court of the City of St. Louis and three residents of St. Louis County appointed by the St. Louis County Supervisor with the approval of the majority of the judges of the Circuit Court of St. Louis County. Section 5.010, Plan of the Metropolitan St. Louis Sewer District. Bogdanor was a resident of St. Louis County and presumably was appointed pursuant to this procedure. Plaintiffs acknowledge that the trial judge who heard the cause took office after the events here in question occurred and that he had no part in the approval of the appointment of the trustees who acted, and particularly Bogdanor. However, the plaintiffs assert that a majority of the St. Louis County Circuit Court's judges having found Bogdanor to have been honest, the same judge might be hesitant to find him otherwise and base MSD's liability on that finding. They contend that, for these reasons, the trial court was, within the meaning of Civil Rule 51.04, V.A.M.R., "interested in the cause before him" and that he should have, therefore, disqualified himself without objection by the parties.

> "To work a disqualification of a judge, the interest must be a direct, certain, and immediate interest, and not one which is indirect, contingent, incidental, or remote. Thus, a direct, apparent, substantial, immediate, or certain interest in the subject matter of the action disqualifies a judge, while an indirect, remote, unreal, uncertain, speculative, incidental, inconsequential, contingent, or merely theoretical, possible, or unsubstantial interest in it does not disqualify him." 30A Am. Jur., Judges, Section 101, page 64. See Annotation, 10 A.L.R.2d 1307.

Here the alleged interest on the part of the trial court certainly was not direct, certain or immediate. The interest charged is speculative in the highest degree and would not call for the trial judge to disqualify himself. Odom v. Langston, 356 Mo. 1140, 205 S.W.2d 518, 520(7); State ex rel. Gentry v. Curtis, 319 Mo. 316, 4 S.W.2d 467, 475(19).

■ This conclusion disposes of the constitutional objection attempted to be advanced by the plaintiffs that they were denied due process of law under the Fourteenth Amendment to the Constitution of the United States because their cause was heard by a judge interested in its outcome. In any event, that objection is not properly before us, having been raised for the first time on appeal. Such procedure does not fulfill our requirement that a constitutional question be raised at the earliest possible moment in order to be preserved for appellate review. State ex rel. Kirks v. Allen, Mo.Sup., 250 S.W.2d 348, 349(1, 2).

The petition in this case was based on the theory that MSD and Schuermann were trustees, the latter of a constructive trust, of the sums deposited and returned, for the plaintiffs as equitable owners of the lots on the date of the election. However, the trial court considered the liability to the plaintiffs to be contractual, based upon the agreement between Land Investment Corporation and MSD. Accordingly, it entered a judgment at law for breach of such contractual obligation. We are of the opinion that our conclusion that no contractual obligation to plaintiffs arose from the agreement in question also disposes of the plaintiffs' complaint, based upon a trust relationship.

■ Insofar as an obligation might be predicated upon the representations found to have been made by Schuermann personnel to lot purchasers is concerned, we note that, in their brief, plaintiffs state: "The salesmen and office staff members did not make individual refund promises. If they did, those promises were invalid. The Earnest Money Receipt and Sales Contract provide that 'no other verbal contract or

understanding exists or representation has been made.' " There is no contention that the sewer deposit was expressly referred to in the earnest money receipts and sales contracts. In view of this position, we would see no object to remanding the cause to permit the plaintiffs to pursue a theory of recovery on the basis of the representations.

We, therefore, conclude that the portion of the judgment of the trial court, which is the basis of the appeal in Case No. 49,962 should be reversed, and that the order appealed from in Case No. 50,023 should be affirmed, and judgment entered, dismissing the petition herein as to all defendants.

HOUSER, C., concurs.

PER CURIAM.

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.